Franklin FARRAR, Plaintiff,

v.

TOWN OF STRATFORD, Defendant.

No. 3:05CV00105(DJS).

United States District Court,
D. Connecticut.

March 19, 2008.

Albert G. Vasko, Eugene N. Axelrod, Employment Law Group, Woodbridge, CT, for Plaintiff.

Warren L. Holcomb, Berchem, Moses & Devlin, P.C., Milford, CT, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The Plaintiff, Franklin Farrar ("Farrar"), brings this action against the Defendant, the Town of Stratford, Connecticut ("the Town"), alleging the following: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title

VII") (Count One); (2) a hostile work environment in violation of Title VII (Count Two); (3) retaliation in violation of Title VII (Count Three); (4) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA") (Count Four); retaliation in violation of the ADEA (Count Five); race discrimination in violation of the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. §§ 46a–60 *et seq.* ("CFEPA") (Count Six); age discrimination in violation of CFEPA (Count Seven); retaliation in violation of CFEPA (Count Eight); aiding and abetting in violation of CFEPA (Count Nine); a violation of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA") (Count Ten); intentional infliction of emotional distress (Count Eleven); and negligent supervision (Count Twelve). Now pending is the Town's motion for summary judgment (**dkt.# 38**) pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated herein, the Town's motion for summary judgment (**dkt.# 38**) is **GRANTED in part and DENIED in part.**

## I. FACTS

Farrar, who is an African–American, was born on August 18, 1942. Since 1978, Farrar has been employed on a regular, full-time, and continuous basis by the Town in the Highway Division of its Public Works Department. He was hired as a full-time laborer, and later worked in several different truck driving positions. From 1995 to the present, Farrar has been employed as a highway crew leader.

At all times during his employment with the Town, Farrar has been part of a bargaining unit represented by the Stratford Public Works Association, Local 134 ("Local 134"), an affiliate of the International Federation of Professional and Technical Engineers, AFL–CIO. Farrar was elected the President of Local 134 in 1988, and he served in that union office until 1998, when

he lost his bid for reelection. The Town and Local 134 have been parties to a number of successive collective bargaining agreements. When Farrar brought this action, the bargaining agreement in effect covered the period from July 1, 2003 to June 30, 2007 ("the Local 134 Agreement").

In his capacity as a highway crew leader, Farrar reports to the Superintendent of Highways, who in turn reports to the Director of Public Works. Alan Craig ("Craig"), who is Caucasian and was born on August 18, 1947, was employed by the Town as its Superintendent of Highways continuously from 1986 until his retirement on August 1, 2003. According to Farrar, his working relationship with Craig started out well.

At all relevant times, Craig was a member of a bargaining unit represented by the Town of Stratford Supervisors' Union, Local 3804, Council 4, AFSCME, AFL–CIO–CLC ("the Supervisors' Union"). The Town and the Supervisors' Union have been parties to a number of successive collective bargaining agreements. When Farrar brought this action, the bargaining agreement in effect covered the period from July 1, 2003 to June 30, 2006 ("the Supervisors' Agreement"). Michael Hudzik ("Hudzik") was employed by the Town as its Director of Public Works from February 1992 to October 26, 2004, when he was given a letter recommending his termination from the Town Manager and ceased working.

In or about the late 1980s and early 1990s, the Town laid off a number of Local 134 Public Works employees. As a result of these layoffs and other labor-management disputes, a large number of grievances and municipal prohibited practice complaints ("MMPs") were filed by Local 134 during that period. During that same period, Farrar was either the Vice Presi-

dent or President of Local 134. Because of the many labor-management disputes between the Town and Local 134, the relationship between Farrar and Craig changed from being friendly to being strictly professional and businesslike. At all times from and after the early 1990s, Farrar and Craig talked to each other very little, and their conversations were limited to work-related matters.

It is Farrar's belief that, from that time onward, Craig viewed him as an "obstacle," and that even after he lost his reelection bid in 1998 and was no longer involved in union matters, Craig continued to regard him as a union advocate. Farrar claims that, in October 1998, after he lost the reelection bid, Craig said, "It's open season," which Farrar perceived to be a threat against him.

From 1995 to late January 2000, the two highway crew leaders were Todd Whitlock ("Whitlock") and Farrar. Whitlock, who had more seniority than Farrar, retired on January 21, 2000. He was replaced by Lou Gallick, Jr. ("Gallick"). When overtime was available, Craig asked Whitlock or, after Whitlock's retirement, Gallick to canvass the employees to see who was available to work the overtime. Farrar claims that he was treated differently than the other crew leaders because he was not asked to canvass employees to see who was available to work the overtime. According to Farrar, he was the senior crew leader after Whitlock retired, and thus he should have been the one to canvass the employees.

At the beginning of each workday, Farrar routinely received his daily work assignments from Craig, although according to Farrar, once he became crew leader, he received his assignments from the Superintendent of Highways. Generally, Farrar did not communicate with Craig during the course of the work day until the end of the day. On relatively infrequent occasions, when problems arose on job sites, Farrar would radio Craig to inform him of the problem. Normally, Craig trusted Farrar's ability to resolve any problems on the job sites. On occasion, though, Craig would visit the job sites. At the end of each workday, Farrar reported to Craig regarding the progress he had made on his daily job assignments.

The parties admit that each weekend, one of the crew leaders is on call and receives standby pay. If an emergency arises and the individual is called into work, he receives overtime pay. For many years, there have been three individuals in the standby overtime rotation, two highway crew leaders and a pay loader operator. On occasions when one of the three regular members in the standby overtime rotation had been absent from work because of an extended medical leave, an acting crew leader was added as the interim third member of the rotation. On one specific occasion, when the pay loader operator retired, the standby weekend overtime was rotated for a brief period of time between Farrar and Gallick. Bob Beaudry ("Beaudry") subsequently became the new pay load operator, and was added to the weekend overtime rotation.

In 2002, Gallick took an extended workers' compensation leave of absence, and Jay Davidson ("Davidson") became the acting crew leader in his place. While Gallick was on leave, only Farrar and the pay loader operator were in the rotation for standby weekend overtime. Also in 2002, Craig sent Farrar to a management course one day per week for six weeks at Housatonic Community College during his regularly scheduled work hours.

Under the Town's Pension Plan, an employee's retirement benefit is calculated based on the employee's earnings for the twenty-four months immediately preceding his or her retirement. Craig claims that,

in the spring of 2002, he heard a rumor that Farrar was considering retiring in May 2003. According to Craig, he had a conversation with Farrar in which he asked Farrar whether he was going to retire in May 2003. Craig claims that he made this inquiry because if Farrar was going to retire, Craig would try to delay placing acting crew leader Davidson in the standby overtime rotation in order to increase Farrar's earnings and retirement benefit. Farrar admits that he had a conversation with Craig, but he asserts that Craig asked him to retire. In addition, Farrar asserts that Craig's proffered reason for making his inquiry is false because, under Local 134 Agreement, Craig did not have the authority to increase Farrar's overtime. The parties admit that the Local 134 Agreement contains a provision requiring that over the course of each contract year, overtime pay must be equalized among employees in the same job classification, i.e., that employees in the same job classification be offered the same amount of overtime.

When Farrar informed Craig that he was not planning on retiring, Craig told Farrar that he was going to add Davidson to the standby overtime rotation. Farrar's interpretation of what Craig told him was that, if Farrar did not retire, Craig would take "his overtime." Both sides admit that during this conversation, no voices were raised, and Craig and Farrar treated each other respectfully.

After this conversation with Craig, acting crew leader Davidson was added to the weekend standby rotation. Farrar claims that he was not assigned weekend standby and overtime for eight months following Craig's conversation with him. Farrar does not recall, however, exactly when this treatment began, and he does not know how much standby and overtime pay he should have received. According to Farrar, the standby and overtime pay he should have received went to Davidson.

In January 2003, Craig gave Farrar the assignment of trimming trees and picking up rocks and debris along a road in the Town, an assignment that Farrar maintains was typically done in the spring, not the winter. Farrar claims that he was given a crew of four men, all of whom were on light duty and could do no manual labor because of medical restrictions. According to Farrar, Craig did not inform him of this situation, and Farrar learned of the restrictions on his crew only when he reached the job site. Farrar further claims that Craig arrived at the job site and yelled at him because no work was being done. Farrar believes that Craig gave him and his crew that particular work assignment in retaliation for something.

During the winter of 2002, the Town had a significant amount of snowfall. Thus, in July 2003, Farrar was assigned the task of surveying snow plow damage to curbs throughout the Town. Following severe winters during which there had been a significant amount of snowplowing, it was not unusual to assign a crew leader to inspect for curb damage, and in the past, highway crew leaders have been given such assignments. Farrar was paid at his regular crew leader rate for performing the inspection of damaged curbs throughout the Town. According to Farrar, assigning him to inspect curbs was discriminatory and retaliatory.

Craig retired as Superintendent of Highways effective August 1, 2003. Hudzik then became the acting Superintendent of Highways. At some point late in the summer of 2003, Hudzik assigned Farrar to visually inspect all of the crosswalks in the Town for the purpose of creating a crosswalk inventory, which would allow the Town to repaint the crosswalks on a regularly scheduled, rather than an ad hoc,

basis. Hudzik did not believe that the crosswalks in the Town had ever been inventoried before, and the information from the inventory was to be put into a computer database. Farrar was paid at the crew leader rate for performing the inventory of the crosswalks. Hudzik believes that this assignment was an appropriate task to give a highway crew leader, whereas Farrar feels that the task of inventorying crosswalks should have been assigned to the Town's "traffic sign maintainer," whose job duties included painting crosswalks and stop bars. Farrar contends that separating him from his crew and assigning him to inspect and inventory the crosswalks in Town constituted harassment based on his age and race.

In August 2003, Hudzik assigned Farrar to build an asphalt parking lot with approximately eight parking spaces in a lawn area adjacent to a driveway to the Town's maintenance department building. For the initial setup work on the parking lot project, Hudzik provided Farrar with a backhoe operator and Pablo Ceballo ("Ceballo"). At the time, Ceballo was restricted to sedentary work due to a medical condition. When Farrar told Hudzik that he could not take Ceballo because he was on restricted sedentary duty, Hudzik replied, "Well, send him out to go get coffee."

Farrar then called the Town's engineering department to do the layout for the parking lot, but was told that the engineering department could not perform the layout because Kevin Morrissey, the assistant engineer, was out sick. When Farrar informed Hudzik that the engineering department could not do the layout, Hudzik replied with words to the effect of "Don't worry about the engineering department. I gave you the job. Do it." Farrar did not object when he was told to do the layout himself.

According to the Town, the construction of the parking lot was a small, non-complex project. For his part, Farrar contends that, with the proper layout and sufficient staffing, such a project would not be complex. Farrar did perform the layout himself by shooting the grades for the parking lot with a transit, creating a list of his rough measurements, and driving stakes at the high and low points of the site. Farrar did have the expertise to perform these tasks, but Farrar contends that it was not standard procedure for a highway crew leader to do so. Nevertheless, the parties agree that highway crew leaders are working supervisors.

For the parking lot project, fill was brought in by truck, which Farrar himself graded by hand using a rake. During the course of the construction of the parking lot, Farrar, when in need of additional manpower or equipment, did not request them from Hudzik, but from acting crew leader Davidson, whose crew was building a retaining wall at the end of the parking lot. The parties admit that when a crew leader needs additional crew members, it is not unusual for him to ask another crew leader to let him have some men from that other crew. Farrar successfully built the parking lot. When the project was completed, Hudzik told Farrar that the parking lot was excellent, and praised him by saying "Good job."

During the approximately seven months that Hudzik was the acting Highway Superintendent, he would, when talking to Davidson, periodically ask in a loud voice, "Have you seen Frank [Farrar]?" when Farrar was standing only ten or fifteen feet away with other highway division employees. On one or more occasions, when Davidson told Hudzik where Farrar was, Hudzik would turn and look in the direction of Farrar, say "I don't see him," and ask Davidson to convey certain information to Farrar. On those occasions, Farrar neither walked over to Hudzik nor said anything to him.

At all relevant times, superintendents in the Public Works Department, including the Superintendent of Highways, were not in the Local 134 bargaining unit. The Town maintains that Section 10.2 of the Local 134 Agreement, which requires job openings to be posted on departmental bulletin boards in all divisions, only refers to openings in job classifications in the Local 134 bargaining unit, not to openings for superintendents who are covered by the Supervisors' Agreement. Thus, Craig, who was hired from the outside as Superintendent of Highways in 1986, filled a position whose opening was not posted on the Local 134's bulletin boards. In addition, the open superintendent position created by Craig's retirement was not posted on any bulletin boards in the Public Works Department. Local 134 did not file a grievance disputing the Town's failure to post the superintendent vacancy in the Public Works Department. Farrar, when discovering that the superintendent position had not been posted in the Public Works Department, asked Hudzik why he didn't post it. Farrar claims that Hudzik replied, "You filed too many grievances. You ought to be glad you got a job." Farrar understood "too many grievances" as referring to grievances he filed when he was union president.

The 2000–2003 Supervisors' Agreement was in effect during 2003; after 2003, a successor agreement was entered into between the Town and the Supervisors' Union. Under the Supervisors' Agreement in effect at all times relevant to the vacancy in the highway superintendent position

created by Craig's retirement, there was no requirement that a vacancy within the Supervisors' Union bargaining unit be posted. In August 2003 and September 2003, the Town placed advertisements for the highway superintendent position in the "Help Wanted" sections of the Connecticut Post and New Haven Register newspapers. The job duties for this position were set forth in a written job description.

Farrar applied for the highway superintendent opening on October 10, 2003 by submitting his resume to the Town's Human Resources Department. After receiving all the resumes, the Town decided to treat the education qualification for the position as a "positive factor" rather than a requirement. After reviewing all the submitted resumes, the Town selected seven candidates who met the position's minimum qualifications to be interviewed by a three-member committee. Farrar was one of those candidates.

The three members of the interview committee were: (1) Paul Kallmeyer ("Kallmeyer"), who at the time was the Director of Public Works and Town Engineer for the Town of Trumbull; (2) John Broadbin, the Deputy Director of Public Works for the Town of Westport; and (3) Dorinda Borer ("Borer"), the Director of Human Resources for the Town of Stratford. All three interview committee members were Caucasian. The interview committee developed a set of standard questions that were asked of each candidate. The candidates' answers were numerically scored by each member of the interview committee, and the higher the cumulative number, the better the score.[1]

---

**1.** Paragraph 105 of the Town's Local Rule 56(a)(1) Statement reads as follows: "Farrar and the other six applicants who were interviewed by the three-member committee were asked the same interview questions and their answers were numerically scored by each member of the interview committee. The higher the cumulative number, the better the

score." (Dkt. # 38, Def.'s Local Rule 56(a)(1) Statement ¶ 105.) In his Local Rule 56(a)(2) Statement, Farrar denies this paragraph. Farrar's denial is not, however, supported by the evidence, as he cites only to his own deposition testimony, in which he stated that he remembered being asked "a whole lot of

The members of the interview committee agreed to individually assign a score of 0 to 10 points for each candidate, with 10 being the highest score.

The total average scores of the seven candidates, of whom Farrar was the only non-Caucasian, were, in descending order, 27, 25.7, 25, 20, 18, 15.5, and 13. Farrar's interview score of 13 was the lowest. The four lowest scoring candidates were eliminated from further consideration for the highway superintendent position. Farrar and the three other candidates who were eliminated were sent the same form letter notifying them that they had not been selected for the highway superintendent position. The three highest scoring candidates were selected for a second round of interviews to be conducted by Hudzik and Michael Feeney ("Feeney"), the Town Manager. Borer was also present during the interviews of the three finalists. Job offers were made to each of those three finalists, but none of them accepted.

Because none of the three finalists accepted the job offer, the opening for the highway superintendent position was again advertised in the newspaper. Based on the resumes submitted, only three qualified candidates were selected for an interview, and only two of the three, George Swift and Kevin White ("White"), were actually interviewed. The three-member interview committee was not reconvened. Instead, Hudzik and Feeney conducted the interviews and eventually offered the position to White, who accepted. Kevin White commenced his employment as the new Superintendent of Highways on March 13, 2004.

Farrar claims that White did not treat him well from day one. For its part, the Town claims that White and Farrar got along at first, but their relationship eventually deteriorated. On one occasion, when White was questioning Farrar about a work assignment in his office, Farrar, from the doorway of White's office, asked an employee named Jeff Endros ("Erdos") to come into the office and explain something to White. After Erdos entered White's office and started answering the question, White cut off Erdos and asked him if he was talking back. Farrar defused the situation by having Erdos leave.

Employees in the highway division are allowed to take a fifteen minute rest break in the morning, which is generally taken from 9:30 a.m. to 9:45 a.m., and a fifteen minute afternoon rest break, which is generally taken from 1:30 p.m. to 1:45 p.m. Farrar adds that the time when those rest breaks were taken could vary depending on what assignment the crew was performing, and that crews would sometimes not take their breaks or combine them. With regard to lunch breaks, the Local 134 Agreement reads as follows: "As far as practicable, lunch periods will be taken from 12:00 noon to 12:30 p.m." (Dkt. # 38, Borer Aff., Ex. A § 3.3.) When Craig was the Superintendent of Highways, he allowed Farrar and his crew to skip the fifteen minute rest breaks at the above-mentioned times, and to take those breaks whenever Farrar and his crew were waiting for a truck to pick up a load of asphalt to be delivered to a job site. This ar-

questions." (See dkt. # 49, Farrar Dep. at 197–98.) This is an insufficient basis upon which to deny the Town's statement of fact because (1) Farrar's testimony does not actually refute the Town's factual assertion; (2) the Town has submitted affidavits from Borer and Kallmeyer, two of the interview committee members, which support the Town's factu-

al assertion (see dkt. # 38, Borer Aff. ¶ 11; dkt. # 53, Kallmeyer Aff. ¶ 5); and (3) Farrar has not presented any evidence to rebut Borer's and Kallmeyer's affidavits. Consequently, the court shall deem admitted paragraph 105 of the Town's Local Rule 56(a)(1) Statement.

rangement was never communicated to White.

On June 29, 2004, White assigned Farrar and his crew to repair damaged curbs on Cutspring Road, which is a couple of miles from the Short Beach parking lot. At 11:45 a.m. that day, White observed Farrar and his crew at the Short Beach parking lot having lunch. Farrar's explanation of this situation is that he was taking a break because he had skipped the morning rest break.

On June 30, 2004, Farrar received his crew's daily assignment at 7:00 a.m. Approximately an hour and twenty minutes later, White saw Farrar and his crew in Farrar's truck driving on Elm Street. Farrar acknowledged that he and his crew had not yet arrived at the job site, and Farrar told White that he was getting water for the crew. The Town maintains that it takes forty-five minutes or less from the time assignments are given at 7:00 a.m. for the crews to arrive at the first job site. Farrar counters that, depending on the location and nature of the job assignment, the time it takes to reach a job site varies. Farrar also states that the crews would routinely stop for coffee or water and ice before proceeding to a job site.

That same day, at 11:20 a.m., White observed Farrar and his entire crew leaving the job site on Cutspring Road in Farrar's truck. Farrar's explanation for leaving the job site was that he was going to pick up the curbing machine, which was at the Public Works Department. White did not accept Farrar's explanations for his conduct that day. In White's opinion, Farrar did not need to have his entire crew accompany him either to get water or to pick up the curbing machine. As a result of the incidents on June 29, 2004 and June 30, 2004, White gave Farrar a documented verbal warning for "abandonment of job responsibility."

On July 1, 2004, White ordered Farrar to sign a daily work assignment sheet. The Town maintains that White's purpose in having Farrar sign the assignment sheet was to try to get Farrar to take responsibility for being given daily assignments and not completing them in a timely fashion. Farrar claims that he never had any problems competing assignments, and that White was attempting to single him out. Farrar refused to sign the assignment sheet, and White abruptly told Farrar to punch out and go home. As a result of Farrar's refusal to comply with White's directive, White suspended Farrar for two days without pay.

Farrar actually was not at work from July 1, 2004 to August 17, 2004. On July 13, 2004, the Town's Human Resources Department received a note from Dr. Chinniah, M.D., Farrar's treating physician, stating that Farrar had been unable to work since July 1, 2004 because of severe anxiety caused by an incident at work on July 1, 2004. The Town received a subsequent note, dated July 19, 2004, from Dr. Chinniah, stating that Farrar had been unable to work since July 1, 2004 because he showed symptoms of depression and anxiety. The Town received another noted, dated July 30, 2004, from Dr. Chinniah, stating that Farrar was under his care due to anxiety, and that he was releasing Farrar to return to work on August 9, 2004.

The Town's Absentee Report for Farrar showed that Farrar was not absent on July 1, 2004, was absent on sick leave from July 2, 2004 through August 6, 2004, worked a half day on August 9, 2004, and then went on vacation until August 17, 2004, when he returned to work. The payroll records for the week of June 28, 2004 indicate that Farrar was paid for three days and received sick pay for one day. The Town claims that when White checked with Hu-

man Resources, he was informed that Farrar had not been marked absent for July 1, 2004, and that Farrar had been on paid sick leave from July 2, 2004 through the following week. According to the Town, White, having received this information from Human Resources, believed that Farrar had not served either day of his two-day suspension. In addition, notwithstanding the notes from Dr. Chinniah, Farrar has testified that he had served the two-day suspension on July 1, 2004 and July 2, 2004, and that he subsequently took vacation time.

On August 17, 2004, White called a meeting with Farrar. According to Farrar, at the meeting White was told that Farrar had already been suspended for insubordination for the June 29, 2004 and June 30, 2004 incidents, and White responded, "Well, it's in my head so you're getting another two days off starting today." At the conclusion of the meeting, White suspended Farrar for two days without pay for Farrar's insubordination on July 1, 2004. Farrar served that suspension on August 17, 2004 and August 18, 2004. The union filed a grievance over Farrar's suspensions, which were still pending when this motion was filed. After August 2004, Farrar either did not receive any further discipline from White, or did receive a verbal warning on December 14, 2005, which he does not specifically recall.

On August 19, 2004, Farrar again went out on sick leave and remained on sick leave continuously for ten months until June 20, 2005, when he returned to work for half days with light duty restrictions. During the period from July 12, 2004 to September 2004, Farrar, on one or more occasions, saw a psychologist for counseling purportedly related to work-related stress and anxiety. Human Resources scheduled Farrar to be examined by Dr. Walter A. Borden, M.D. ("Dr. Borden"), a board-certified psychiatrist, on September 8, 2004. This examination was rescheduled for October 5, 2004. On October 5, 2004, Farrar was provided with transportation to Dr. Borden's office, but the examination by Dr. Borden was not completed. The Town has sent other employees, including Caucasian employees, who were absent from work on extended sick leave due to psychological or mental health reasons to be examined by a Town-selected psychiatrist.

On November 29, 2004, Dr. Chinniah diagnosed Farrar has having Guillain–Barre Syndrome, which affects the peripheral nervous system and causes weakness or paralysis to the extremities. Human Resources then scheduled Farrar for examination and neuropsychological testing by Dr. Stephen Peters ("Dr. Peters"), a neuropsychiatrist, on May 4, 2005, at the Town's expense and with transportation provided. Farrar arrived at Dr. Peters' office at the scheduled date and time but did not allow the examination to proceed.

By a note dated May 16, 2005, Dr. Chinniah released Farrar so that he could return to work in a restricted or light duty capacity on June 16, 2005. The Town required Farrar to undergo a fitness for duty examination by Dr. Peters at the Town's expense and with transportation provided. The Town maintains that it is common practice for the Town to require employees who have been absent on medical leave for an extended period to undergo fitness for duty examinations before allowing those employees to return fully to work. Farrar denies this, claiming that the Town did not have a uniform policy regarding fitness for duty examinations, and that the Town allowed employees to return to work based solely on reports from treating physicians. On June 7, 2005, Farrar was examined by Dr. Peters, whose report indicated that, although Farrar's symptoms were consistent with Guillain–Barre

Syndrome, a definitive diagnosis of Guillain–Barre Syndrome could not be made without an EMG study or by cerebral fluid analysis. Dr. Peters opined that Farrar could return to light duty/restricted work, and, to facilitate the development of increased endurance, recommended reduced hours for the first three or four weeks of Farrar's return to work. When this motion was filed, the Town had not received any information that Farrar had undergone an EMG study or cerebral fluid analysis to confirm his diagnosis of Guillain–Barre Syndrome.

On June 20, 2005, Farrar returned to light duty, restricted work for four hours per day, from 7:00 a.m. to 11:00 a.m., and was still working in that restricted capacity when this motion was filed. During Farrar's ten-month medical leave of absence, other employees, such as Tony Basso, became the acting crew leader in charge of Farrar's crew. Since Farrar's return to work for half days, one of those individuals has continued to perform as a full-time acting crew leader. During the half days he works, Farrar is the crew leader in charge of a small crew assigned to fix pot holes.

## II. DISCUSSION

Farrar alleges that the Town's conduct violated Title VII, the ADEA, CFEPA, the LMRA. Specifically, Farrar alleges that: (1) he was wrongfully denied a promotion in violation of Title VII, the ADEA, and CFEPA; (2) he was subjected to a hostile work environment in violation of Title VII, the ADEA, and CFEPA; (3) he was retaliated against in violation of Title VII, the ADEA, and CFEPA; and (3) he was retaliated against in violation of the LMRA. Farrar also alleges intentional infliction of emotional distress and negligent supervision. The Town has moved for summary judgment on all counts of Farrar's complaint except Count Twelve, the negligent supervision claim. The court shall discuss the Farrar's claims seriatim.

## A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. FAILURE TO PROMOTE

Farrar alleges that he was discriminated against because of his race and age. Title

VII of the Civil Rights Act of 1964 directs that it is "unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex or national origin...." 42 U.S.C. § 2000e–2 (a)(1). The ADEA directs that it is "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...." 29 U.S.C. § 623(a)(1). The protections of the ADEA reach individuals who are at least 40 years old. 29 U.S.C. § 631(a).

Substantive Title VII claims, including failure-to promote-claims brought pursuant to Title VII, are analyzed using the familiar burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Johnson v. Conn. Dept. of Corr.,* 392 F.Supp.2d 326, 333 (D.Conn.2005). Claims brought under the ADEA are analyzed under the same burden-shifting framework. *See Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir. 2001); *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 153–54 (2d Cir.2000). Thus, the court shall analyze the Title VII and ADEA failure to promote claims together. The Second Circuit has described the applicable legal standard for the evaluation of employment discrimination claims as follows:

> At the outset, a plaintiff can avoid dismissal by presenting the "minimal" prima facie case defined by the Supreme Court in *McDonnell Douglas.* This requires no evidence of discrimination.... By making out this "minimal" prima facie case, even without evidence of discrimination, the plaintiff creates a pre-

sumption that the employer unlawfully discriminated, ... and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action.

> . . .

> On the other hand, once the employer articulates a non-discriminatory reason for its actions, ... the presumption completely drops out of the picture.... The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated ... remains at all times with the plaintiff.... Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment (or to the overturning of a plaintiff's verdict) unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.

*James,* 233 F.3d at 153–54 (internal quotations marks and citations omitted).

■ To establish a *prima facie* case of a discriminatory failure to promote, a plaintiff must ordinarily demonstrate that: (1) he is a member of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications. *See Petrosino v. Bell Atl.,* 385 F.3d 210, 226 (2d Cir.2004) (Title VII); *Mauro v. S. New England Telecomms., Inc.,* 208 F.3d 384, 386 (2d Cir.2000) (ADEA). Farrar undoubtedly is a member of a protected class under both Title VII and the ADEA. The parties do not dispute that Farrar applied and was qualified for the position, for which he was rejected. There appears to be some dispute as to whether the circumstances surrounding the decision to not promote Farrar give "rise to an inference of discrimination." As the court reads the

case law, however, Farrar meets his burden if he can show that the position remained open and the employer continued to seek applicants having the plaintiff's qualifications. The court believes that Farrar has done so here, and thus finds that Farrar has established his *prima facie* case.

Next, the burden shifts to the Town to articulate a legitimate, non-discriminatory reason for its actions. The Town has done so here by asserting that other applicants had better resumes than Farrar, and that other applicants performed better than Farrar during the interviews for the position. Thus, the burden shifts back to Farrar to demonstrate that the Town's proffered reasons are pretext for unlawful discrimination.

■ The court finds that Farrar has failed to meet his ultimate burden. First, the court sees no evidence that Farrar's race played a part in the promotion process. The fact that Farrar is an African-American who did not receive the promotion is insufficient, by itself and without any evidence of racial animus, to demonstrate a Title VII violation. To hold otherwise would allow any person who is a member of a protected class under Title VII to prevail on a Title VII claim simply because he or she did not get a desired promotion.

Farrar's arguments regarding pretext are insufficient to demonstrate racial animus on behalf of the Town. The fact that Farrar was the only African-American candidate selected for an interview does not support Farrar's position because no evidence has been submitted showing that the Town excluded African-Americans from the interview process, or that any other African-Americans even applied for the position. Furthermore, the fact that Farrar was, in fact, selected for an interview cuts against his pretext argument.

The court also finds fault with Farrar's argument regarding the selection process. Farrar, citing to deposition testimony, argues that Borer, one of the members of the interview committee, had "already formed an opinion that Farrar was not qualified and was difficult." This is not how Borer's testimony reads. Borer testified that though "conversations with Frank [Farrar]," she was led to believe that he was not necessarily "technical" or "educated." (*See* dkt. # 49, Borer Dep. at 54.) But Borer also testified that she "treat[ed] [Farrar] as if he were any other candidate" because she "always like[d] to give somebody internally an opportunity" and because she "like[d] to promote from within." (*See id.*) Moreover, even if Borer had formed an opinion that Farrar was unqualified and difficult, the court fails to see how evidence of such an opinion, without more, contains any racial implications.[2] Farrar goes on to argue that the other two interviewers, who were not employees of the Town, were recommended by Hudzik, who "knew them" and "had formed his own opinions regarding Farrar." Again, the court fails to see how this argument could support the notion that the members of the interview committee harbored racial animus toward Farrar. Even if the court were to assume that Hudzik harbored racial animus toward Farrar, the court cannot impute that animus to these interview committee members simply because Hudzik "knew them." This is wholly insufficient to support a Title VII claim.

■ Farrar further argues that the test used by the Town during the interview

---

**2.** Moreover, the Town has submitted the score sheet from the interview committee, in which it appears that Borer actually scored Farrar equally to two other interviewees, who were Caucasian. (*See* dkt. # 38, Borer Aff., Ex. D.) This fact further undercuts any argument Farrar might make regarding Borer's motives.

process demonstrates that its reasons for not promoting Farrar were pretextual. According to Farrar, the test was "totally subjective," and that grading responses to the "technical questions" regarding the position "in and of itself gives rise to an inference of discrimination." The court disagrees. To begin with, despite Farrar's claims to the contrary, the Town has submitted affidavits from the interviewers, in which they state that the scores were based on both the interviewees' responses to questions in the interviews and their resumes. The court does not doubt that there was a "subjective" component to the interview, but "[t]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104 (2d Cir. 2001) (internal quotation marks omitted). Additionally, scoring answers on "technical" questions must have some basis in objectivity; it is not merely grading the "impression" an individual makes during an interview.[3] "Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of ... qualifications, no inference of discrimination can be drawn." *Id.* at 105.

Farrar, citing to Borer's affidavit, asserts the following: "Stratford is now claiming that Farrar was not promoted because his paper qualifications were inferior to the other candidates.... Stratford deemed Farrar qualified for the position when it selected him to be interviewed. The scores of the interviewees were solely based on the interviews themselves. The individuals' qualifications were not considered in the scoring." (Dkt.# 49, p. 15.)

This assertion is patently contrary to the very citation provided, though. In Paragraph 14 of Borer's affidavit (which is the very same paragraph to which Farrar cites), Borer, after noting that Farrar and three other applicants did not answer the interview questions as well as the other three candidates, explicitly states that "[i]n addition, the three top scoring candidates had superior qualifications and experience to those of the plaintiff as shown by their respective resumes." (Dkt. # 38, Borer Aff. ¶ 14.) Thus, it is clear that the Town is not "now claiming that Farrar was not promoted because his paper qualifications were inferior to the other candidates." Instead, the Town is claiming that Farrar's answers to the questions during the interview, coupled with his resume, were found to be lacking compared to answers and resumes of the three candidates who were selected for a second interview.

Farrar also challenges the Town's characterization of the "paper" credentials of the applicants. According to Farrar, it is "highly subjective" for the Town to argue that the three individuals who were offered second interviews had superior qualifications to Farrar. Farrar takes his "subjective" argument too far here. To follow Farrar's assertion to its logical conclusion, any hiring or promotion decision based on the applicants' resumes would always be subject to Title VII liability because such a decision would be "subjective." For example, under Farrar's logic, it is "subjective," and hence pretextual, for an employer to value one type of experience over another. The court shall not adopt such a position. As the Second Circuit has noted, "the court must respect the employer's unfettered discretion to choose among qualified candidates." *Byrnie*, 243 F.3d at 103; *see*

---

**3.** It also appears that all the interviewees were asked the same "technical" questions. Farrar presents no evidence that he was somehow singled out or discriminated against with regard to the actual questions asked.

*Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir.) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.")

Quite simply, there is a dearth of any evidence demonstrating that the Town's proffered reasons for not promoting Farrar are pretext for racial animus. There is no evidence that Farrar's interview was in any way different from the interviews of the other candidates. There is no evidence that the Town waived, to Farrar's detriment, any qualifications required for the position.[4] There is no evidence that Farrar's credentials were "so superior to the credentials of the person selected f o r the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Byrnie,* 243 F.3d at 103. Because Farrar has failed to show that the Town's proffered explanations are unworthy of credence, with regard to Farrar's Title VII failure to promote claim, the Town's motion for summary judgment (**dkt.# 38**) is **GRANTED.**

■ Farrar's failure to promote claim under the ADEA also fails as a matter of law. The parties, in their memoranda of law, focus on Title VII, i.e., they mainly discuss race discrimination. Nevertheless, the Town has also moved for summary judgment on the ADEA claim. Farrar argues that he "was the oldest of the candidates for the superintendent position" and that he "was treated differently than his younger counterparts." Farrar presents no evidence, and makes no arguments, that the Town's reasons for not promoting him are pretext for wrongful age discrimination. For example, al-

though he asserts that the other applicants were younger than he was, Farrar presents no evidence regarding the age of the other applicants or the interviewers. Moreover, stating that he was "treated differently than his younger counterparts" is not accurate. Even assuming that all the other applicants were younger than Farrar (which Farrar has not, in fact, established), he was treated exactly the same as three of these applicants: he was denied the promotion. Given this lack of evidence, with regard to Farrar's ADEA failure to promote claim, the Town's motion for summary judgment (**dkt.# 38**) is **GRANTED.**

■ Farrar also brings his failure to promote claims under CFEPA, alleging race and age discrimination. CFEPA directs that "[i]t shall be a discriminatory practice in violation of this section[ ][f]or an employer . . . to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, or age . . . ." Conn. Gen.Stat. § 46a–60(a)(1). "The Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA." *Kelley v. Sun Microsystems, Inc.,* 520 F.Supp.2d 388, 400 (D.Conn.2007) (internal quotation marks omitted); *see Levy v. Comm'n of Human Rights and Opportunities,* 236 Conn. 96, 103, 671 A.2d 349 (1996) ("Although this case is based solely on Connecticut law, we review federal precedent concerning employment discrimination for guidance in enforcing our own anti-discrimination statutes."); *Vasquez v. Claire's Accessories, Inc.,* 392 F.Supp.2d 342, 349 (D.Conn.2005) ("CFEPA claims

---

**4.** Indeed, the Town's waiver of the education qualification actually benefitted Farrar, along with other applicants.

are analyzed in the same manner as Title VII employment discrimination claims."). Because Farrar's CFEPA failure to promote claims are analyzed in the same manner as his Title VII failure to promote claim and his ADEA failure to promote claim, the court need not go into further detail here. The court has already analyzed Farrar's failure to promote claims under federal law and found that they fail as a matter of law. Therefore, Farrar's CFEPA failure to promote claims also fail as a matter of law. Consequently, with regard to Farrar's CFEPA failure to promote claims, the Town's motion for summary judgment (**dkt.# 38**) is **GRANTED**.

## C. HOSTILE WORK ENVIRONMENT

■ Farrar alleges that he was subjected to a hostile work environment because of his race and age. Title VII hostile work environment claims and ADEA hostile work environment claims are analyzed in the same way. *See Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir.1999). Title VII and the ADEA have been interpreted to prohibit conduct "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "A hostile work environment claim requires a showing [1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.2002) (internal quotation marks omitted); *see Harris*, 510 U.S. at 21, 114 S.Ct. 367.

■ "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of h[is] employment were thereby altered," *Alfano*, 294 F.3d at 373, and that such harass-

ment occurred because of his race or age, *see e.g., Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that Title VII is directed only at discrimination based upon the categories protected by Title VII). "This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Alfano*, 294 F.3d at 374 (internal quotation marks omitted). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.... Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* (internal quotation marks and citations omitted). Nevertheless, "it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id.* "In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* (internal quotation marks omitted).

■ With regard to Farrar's allegations about Craig's conduct, the court finds that Farrar's hostile work environment claim fails as a matter of law. From what the court can discern, Farrar alleges that Craig's wrongful conduct consisted of the following: (1) considering Farrar an "obstacle" because of his union activities, and saying "It's open season" when Farrar lost his union reelection bid; (2) allowing other crew leaders to canvass the employees to see who was available to work overtime;

(3) talking to Farrar about retirement[5]; (4) not assigning Farrar standby or overtime pay after the retirement discussion; (5) assigning Farrar in January 2003 to trim trees and pick up rocks and debris along a road; and (6) assigning Farrar in July 2003 to survey the damage done to the Town's curbs because of snowplow activity from the previous winter.

In the court's view, the objective element of the hostile work environment test is not met here because Farrar has not alleged misconduct conduct that is sufficiently severe or pervasive enough to alter the conditions of the his employment. To begin with, Craig's alleged conduct is episodic, as the above-mentioned incidents are simply a series of incidents occurring over a period of time from the early 1990s to 2003 that appear to have no relation to each other. In addition, aside from conveying his personal perception that he was being slighted, Farrar has not shown that his workplace was so "permeated with discriminatory intimidation, ridicule, and insult," nor is any one of the incidents described above so "extraordinarily severe," that the conditions of his employment were altered.

Moreover, even if Farrar had shown such an objectively hostile working environment, he has provided no evidence that any of Craig's alleged harassment occurred because of Farrar's race or age. In fact, from what the court can discern, Craig's alleged conduct resulted from the labor-management disputes between the Town and Local 134, of which Farrar had been President for approximately ten years. Farrar himself admits that his relationship with Craig was friendly until these many labor-management disputes occurred. This indicates that Craig's alleged hostility toward Farrar was not because of Farrar's race or age, but through a personality dispute that arose from Craig's displeasure over Farrar's union activities. As the Seventh Circuit has put it,

"Federal law provides that an employee is to be free from racial [and age] discrimination in the workplace, which includes freedom from a ... hostile work environment [based upon race or age]. It does not guarantee a utopian workplace, or even a pleasant one. If the workplace is unsavory for any reason other than hostility generated on the basis of race, gender, ethnicity, or religion, no federal claim is implicated. In short, personality conflicts between employees are not the business of the federal courts."

*Vore v. Ind. Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir.1994); *see Labonia v. Doran Assocs., LLC*, No. 3:01CV2399 (MRK), 2004 WL 1921005, at *8 (D.Conn. Aug. 25, 2004); *Broughton v. Conn. Student Loan Found.*, 64 F.Supp.2d 64, 68 (D.Conn.1999); *Serrano v. Runyon*, No. 3:95–469(DJS), 1997 WL 718976, at *3 (D.Conn. Aug. 22, 1997). Thus, even assuming that there was harassment by Craig, Farrar has not shown that such harassment occurred because of his race or age, which is a *sine qua non* for hostile work environment claims under Title VII or the ADEA. *See Oncale*, 523 U.S. at 80, 118 S.Ct. 998.

■ With regard to Farrar's allegations about Hudzik's conduct, the court also finds that Farrar's hostile work environment claim fails as a matter of law. From what the court can discern, Farrar alleges that Hudzik's wrongful conduct consisted of the following: (1) assigning Farrar to

---

5. As noted above, the Town claims that Craig asked Farrar whether he was whereas Farrar claims that Craig asked him to retire. For the purposes of this motion, the court must resolve all ambiguities in Farrar's favor. Therefore, the court shall assume that Craig asked Farrar to retire.

inspect and inventory the crosswalks in the Town; (2) assigning Farrar to build the parking lot; (3) not posting the open superintendent position in the Public Works Department, and, when Farrar asked why this was so, stating "You filed too many grievances. You ought to be glad you got a job."; and (4) pretending to not see Farrar when Farrar was ten or fifteen feet away from him.

Again, the court finds that Hudzik's alleged conduct here is episodic, as the above-mentioned incidents are simply a series of incidents occurring over a period of time that appear to have no relation to each other and are not tied to Farrar's race or age. Furthermore, Farrar has not shown that any one of the incidents described above is "extraordinarily severe." Aside from expressing his own personal beliefs in his deposition testimony, Farrar presents no evidence that the tasks assigned to him by Hudzik were so severe or pervasive that a hostile work environment was created. In addition, with regard to the parking lot assignment, although Farrar claims that he was not given sufficient manpower for the job, all the evidence indicates that Farrar was able to do the job with the personnel he was given, and that he was praised by Hudzik for a job well done. This does not constitute a workplace atmosphere that is "permeated with discriminatory intimidation, ridicule, and insult." Moreover, with regard to the crosswalk assignment, Farrar did not testify that he was given the assignment because of his race or age; rather, Farrar testified that he was given the assignment in retaliation for filing discrimination complaints. That is, based on Farrar's own testimony, Hudzik's conduct here was retaliatory, and retaliation claims are distinct from, and not analyzed the same way as, hostile work environment claims based on race or age. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115–16, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

The same holds true for Hudzik's not posting the opening for the superintendent position in the Public Works Department. To begin with, the court fails to see how this action was directed specifically at Farrar, considering that the failure to post the opening in the Public Works Department would necessarily affect everybody else in that department. Moreover, as again evidenced through Farrar's deposition testimony, Hudzik's alleged reason for his conduct was to retaliate against Farrar for filing too many union grievances, not Farrar's race or age. Indeed, there is no evidence that any of the incidents listed above occurred on account of Farrar's race or age. The fact that Farrar happens to be an African–American within the protected age class is, by itself, insufficient to demonstrate that these incidents occurred because of his race or age.

With regard to Farrar's allegations about White's conduct, the court again finds that Farrar's hostile work environment claim fails as a matter of law. From what the court can discern, Farrar alleges that White's wrongful conduct consisted of the following: (1) cutting off Erdos and asking him if he was talking back after Farrar had asked Erdos to come into White's office and explain a work assignment; (2) giving Farrar a documented verbal warning for "abandonment of job responsibility" after having observed Farrar: (a) take an early lunch on June 29, 2004; (b) arrive to a work site an hour and twenty minutes after receiving his work assignment on June 30, 2004; and (c) leave that site, with his entire crew, at 11:30 a.m.; and (3) ordering Farrar to sign a daily work assignment sheet and suspending Farrar for refusing to do so.

The objective element of the hostile work environment test is not met here because the alleged misconduct conduct is not sufficiently severe or pervasive enough

for a hostile work environment claim. With regard to the incident involving Erdos, White's alleged hostility appears to have been directed at Erdos, not Farrar. Indeed, the parties agree that Farrar actually "defused" the situation. Thus the court fails to see how this can support Farrar's hostile work environment claim. With regard to the verbal warning stemming from White's observations of Farrar's conduct while on the job, Farrar has not presented conclusive evidence showing that such a warning was improper. For example, with regard to the June 29, 2004 incident, even assuming that Farrar had been allowed to alter the times for his breaks under previous supervisors, the court does not see how this would prevent a new supervisor from enforcing the rules regarding breaks more strictly. The same holds true with regard to the June 30, 2004 incidents. There is no evidence that White, as a new supervisor, could not be more strict with his subordinates by restricting coffee or water stops before a crew arrived at a site, or, when a crew needed a piece of equipment, by disallowing an entire crew from leaving a site to get that piece of equipment. Put simply, White's conduct was not "extraordinarily severe" enough to sustain Farrar's hostile work environment claim.

■ Moreover, Farrar has not shown that, by White's conduct, his workplace was permeated with discriminatory intimidation, ridicule, and insult. The court sees no evidence that White's conduct, even assuming that it created a hostile work environment, was motivated by Farrar's race or age. Whatever conflicts there may have been between Farrar and White, there is no evidence that they were anything but personality conflicts, which are beyond the scope of Title VII and ADEA hostile work environment claims. *See Vore*, 32 F.3d at 1162.

■ The court also finds that the Town's conduct in scheduling Farrar to undergo psychiatric testing is insufficient to support Farrar's hostile work environment claims. Farrar's argument that the Town had no uniform policy with regard to these examinations is unavailing because there is no indication the Town scheduled Farrar for this testing because of his race or age. Indeed, Farrar has admitted that the Town scheduled such testing for other employees, including Caucasian employees, who were absent from work on extended sick leave for psychological or mental health reasons.

With regard to the Town's requirement that Farrar undergo a fitness for duty examination, there is also a lack of evidence that the Town's conduct was motivated by Farrar's race or age. Farrar's asserts that there was no uniform policy for this, whereas the Town maintains that it is common practice to require such examinations. Farrar has failed to demonstrate that this was not a common practice in the Town, despite the submitted deposition testimony from Erdos, who testified that, although he did not remember for certain, he may not have had to undergo a fitness for duty examination before returning to work. This is insufficient to support Farrar's hostile work environment claims. Consequently, with regard to Farrar's Title VII and ADEA hostile work environment claims, the Town's motion for summary judgment (**dkt.# 38**) is **GRANTED**. Furthermore, because the Connecticut Supreme Court looks to federal precedent when interpreting and enforcing CFEPA, *see Kelley*, 520 F.Supp.2d at 400, with regard to Farrar's CFEPA hostile work environment claim, the Town's motion for summary judgment (**dkt.# 38**) is **GRANTED.**

### D. RETALIATION

Farrar alleges that the Town retaliated against him in violation of Title VII, the

ADEA, and CFEPA. Title VII, the ADEA, and CFEPA prohibit retaliation against employees who exercise rights protected by the statute, *see* 42 U.S.C. § 2000e–3(a); 29 U.S.C. §§ 621(d); Conn. Gen.Stat. §§ 46a–60(a)(4). Before the court can address the substance of Farrar's retaliation claims, however, it must first determine what conduct may be properly considered to support these claims. "An individual wishing to challenge an employment practice under [Title VII] must first file a charge with the EEOC." *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* —— U.S. ——, ——, 127 S.Ct. 2162, 2166, 167 L.Ed.2d 982 (2007). The same is true for ADEA claims. *See Dezaio v. Port Authority of N.Y. and NJ,* 205 F.3d 62, 64–65 (2d Cir.2000). "Such a charge must be filed within a specified period...." *Ledbetter,* 127 S.Ct. at 2166.

In general, Title VII and ADEA discrimination claims must be filed with the EEOC within 180 days of the date on which the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1) (Title VII); 29 U.S.C. § 626(d) (ADEA). If, however, a claimant has filed a charge of discrimination in a state or locality that has its own anti-discrimination laws and enforcement agency, the time period for filing claims with the EEOC is extended to 300 days from the date of the unlawful practice. 42 U.S.C. § 2000e–5(e)(1); 29 U.S.C. § 626(d). Connecticut has its own anti-discrimination agency, the CHRO.

Farrar has filed a charge alleging retaliation based on race and age with both the EEOC and CHRO. Thus, the 300–day limitation applies to the his claims here. "This requirement functions as a statute of limitations, ... in that discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court...." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.

1998) (internal citations omitted); *see Ledbetter,* 127 S.Ct. at 2166–67 ("[I]f the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court...."). By the court's calculation, the earliest possible retaliatory conduct that Farrar could allege must have occurred on or after January 16, 2003, which is 300 days prior to November 12, 2003. Thus, any conduct prior to January 16, 2003 cannot be considered here.

Title VII and ADEA retaliation claims are reviewed under the *McDonnell Douglas* burden-shifting framework. *See Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003) ("The *McDonnell Douglas* burden shifting analysis used in claims of discrimination ... also applies to retaliation claims...."). First, "[t]he complainant ... must carry the initial burden under the statute of establishing a *prima facie* case...." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. "In order to establish a *prima facie* case of retaliation, [a plaintiff] must show that: (1)[ ]he engaged in a protected activity; (2) h[is] employer was aware of this activity; (3) the employer took adverse employment action against h[im]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 608 (2d Cir.2006).

Second, if a plaintiff establishes a *prima facie* case, "[t]he burden then must shift to the [defendant] to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Third, if the defendant does articulate a legitimate, nondiscriminatory reason for the adverse employment action, "[t]he plaintiff then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but

were a pretext. . . .' " *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir.2004) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *see McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817.

 The court then must determine whether Farrar has met his *prima facie* case. The parties do not dispute that Farrar filed CHRO/EEOC charges in 2000 and 2001, and that the CHRO/EEOC charge for this case was filed on November 12, 2003. Farrar also maintains that he filed a Title VII action against the Town in 1996. All of these constitute protected activities under Title VII and the ADEA. With regard to the 2000 and 2001 charges, however, the Town argues that there is no causal connection between these protected activities and the alleged retaliatory conduct (of which, for the purposes of this action, the court can consider only incidents occurring on or after January 16, 2003) because the length of time between them is too great.

 It is true, as the Town points out, that "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir.2001) (internal quotation marks omitted). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir.2001) (collecting cases). Still, "[i]n the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be

insufficient to establish this temporal relationship." *Wilks v. Elizabeth Arden, Inc.*, 507 F.Supp.2d 179, 196 (D.Conn.2007) (citing *Deravin v. Kerik*, No. 00 CV 7487(KMW)(KNF), 2007 WL 1029895, at *11 (S.D.N.Y. April 2, 2007) (collecting cases)). If the court were to consider only this indirect way of establishing a causal connection, the Town would be correct: Farrar's protected activities in 1996, 2000, or 2001 would be too remote in time to establish a causal connection with conduct that occurred on or after January 16, 2003.

 The Town's argument, however, is incomplete. "Of course, the causal connection between a protected activity and an adverse employment action may be [directly] established. . . ." *Id.; see Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (noting that a plaintiff may demonstrate a causal connection "through evidence of retaliatory animus directed against the plaintiff by defendant.") That is, if Farrar can provide direct evidence of retaliatory animus, he need not provide indirect evidence of a causal connection by showing that the protected activity closely followed the adverse action. Indeed, the *McDonnell Douglas* test itself "is inappropriate in cases where there is direct evidence that retaliation played a part in the employment decision." *Talada v. Int'l Serv. Sys., Inc.*, 899 F.Supp. 936, 955 (N.D.N.Y.1995). Instead, the court would apply the test set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), whereby the relevant inquiry "is whether retaliation was a substantial or motivating factor in the decision making process. In showing retaliation to be a substantial or motivating factor, plaintiffs need not show the retaliation to be the determinative or deciding factor, or that defendants' decision would have been different, absent this factor." *Talada*, 899 F.Supp. at 955 (citing

*Price Waterhouse,* 490 U.S. at 250, 109 S.Ct. 1775). The burden then shifts to the employer to show that it would have subjected the employee to the same adverse conduct even if retaliation had not been considered in its decision. *Price Waterhouse,* 490 U.S. at 242, 109 S.Ct. 1775.

In their memoranda of law, the parties discuss only the *McDonnell Douglas* test, and do not argue whether the *Price Waterhouse* test could apply here. Nevertheless, the court finds that summary judgment is inappropriate with regard to Farrar's retaliation claims. First, the court believes that Farrar might be able to present direct evidence of retaliatory animus against him based on comments allegedly made by Craig and Hudzik. After Farrar lost his reelection bid for President of Local 134, Craig allegedly told Farrar "It's open season." In addition, when Farrar questioned Hudzik about not posting the opening for the superintendent position, Hudzik allegedly replied, "You filed too many grievances. You ought to be glad you got a job."[6] In the court's view, a reasonable finder of fact could find these comments to be direct evidence that Farrar's supervisors harbored retaliatory animus against him, obviating the need for an analysis under *McDonnell Douglas.*

Second, even under the *McDonnell Douglas* test, the court believes that Farrar also might be able to indirectly demonstrate a causal connection via the temporal relationship between his November 12, 2003 EEOC/CHRO charge and the purported subsequent adverse actions taken against him. With respect to the retaliation claims, the Town does not discuss these incidents in much detail, and fails to discuss some of the incidents at all. As the court described above, however, there are a number of incidents after November 12, 2003 that Farrar claims were adverse actions taken against him, and some of these occurred only a few months after November 12, 2003.

The parties' analyses of what actually constitutes an adverse employment action for the purposes of retaliation claims are limited. With regard to what constitutes an adverse employment action for Title VII or ADEA retaliation purposes, the Supreme Court has held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (internal quotation marks omitted).

In the Second Circuit, "[e]mployment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Kessler v. Westchester County Dept. of Soc. Servs.,* 461 F.3d 199, 207 (2d Cir.2006) (internal quotation marks omitted). "Nevertheless, as seen in *White,* the means by which an employer can retaliate against an employee are 'not limited to discriminatory actions that affect the terms and conditions of employment.'" *Eiden v. McCarthy,* 531 F.Supp.2d 333, 352–53 (D.Conn.2008) (quoting *White,* 126 S.Ct. at 2412–13). Instead, "retaliation claims have a 'more relaxed standard' than substantive anti-discrimination claims, and are not limited to

---

**6.** Although Farrar may have understood "too many grievances" to refer to grievances he filed when he was union president, it is Hudzik's understanding of "too many grievances" that is relevant, for Hudzik made the comment, and his intent is at issue.

conduct ... such as hiring, firing, change in benefits, or reassignment." *Kelley*, 520 F.Supp.2d at 404. "Again, the plaintiff must show that his employer's actions well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citing *White*, 126 S.Ct. at 2415).

The focus of the Town's retaliation arguments was not on the adverse employment action portion of the *prima facie* case in the *McDonnell Douglas* analysis. The court believes, though, that Farrar has met the "more relaxed standard" of adverse employment actions for retaliation claims, as a reasonable finder of fact could determine that the Town's actions well might have dissuaded a reasonable worker from making or supporting a discrimination charge. The parties do not discuss the remainder of the *McDonnell Douglas* burden-shifting framework (i.e., legitimate, non-discriminatory reasons for the Town's conduct, and pretext). Consequently, with regard to Farrar's Title VII and ADEA retaliation claims, the Town's motion for summary judgment **(dkt.# 38)** is **DENIED.** Furthermore, because the Connecticut Supreme Court looks to federal precedent when interpreting and enforcing CFEPA, *see Kelley*, 520 F.Supp.2d at 400, with regard to Farrar's CFEPA retaliation claim, the Town's motion for summary judgment **(dkt.# 38)** is **DENIED.**

### E. AIDING AND ABETTING

Farrar also alleges aiding and abetting in violation of CFEPA. CFEPA makes it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so...." Conn. Gen.Stat. § 46a–60 (a)(5). Because the court has granted summary judgment with regard to Farrar's CFEPA failure to promote and hostile work environment claims, the aiding and abetting

claim necessarily must relate to the CFEPA retaliation claim.

■ The Town is entitled to summary judgment on the aiding and abetting claim. First, the Town moved for summary judgment on this issue, but, in his opposition memorandum, Farrar presented no legal arguments to support his aiding and abetting claim. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Ludwiczak v. Hitachi Capital Am. Corp.*, 528 F.Supp.2d 48, 59 (D.Conn.2007) (quoting *Douglas v. City of Waterbury*, 494 F.Supp.2d 112, 122 (D.Conn.2007)). Because Farrar did not address the aiding and abetting claim in his opposition memorandum, the court shall deem that claim abandoned.

■ Second, even if it were not abandoned, Farrar's aiding and abetting claim fails as a matter of law. "The law in Connecticut is clear that while an individual employee may be held liable for aiding and abetting his employer's discrimination, an employer can not be liable for aiding and abetting its own discriminatory conduct." *Canty v. Rudy's Limousine*, No. Civ.A.3:04CV1678(CFD) 2005 WL 2297410, at *2 (D.Conn. Sept. 15, 2005) (citing *Bolick v. Alea Group Holdings, Ltd.*, 278 F.Supp.2d 278, 282 n. 5 (D.Conn.2003)). Thus, a plaintiff

> may seek recovery from individual ... employees for illegally aiding and abetting discrimination against him, should he choose to file an independent lawsuit or to join those parties as defendants to this action. His remedy for the [employer's] conduct, however, lies in the direct claims of discrimination he has raised in ... his complaint. [The employer] cannot have discriminated against him and, at the same time, aided

and abetted itself in discriminating against him.

*Id.*

In Count Nine, Farrar alleges that Borer and the Town aided and abetted discriminatory conduct. As noted above, though, the Town cannot have discriminated against him and, at the same time, aided and abetted itself in discriminating against him. Therefore, any aiding and abetting allegations against the Town must fail. Furthermore, simply mentioning Borer in Count Nine is insufficient to sustain this aiding and abetting claim against her because Borer is not a named defendant in this action. Indeed, Farrar's complaint is against the Town only. Consequently, with regard to Farrar's aiding and abetting claim, the Town's motion for summary judgment (**dkt.# 38**) is **GRANTED.**

### F. LMRA

Farrar alleges that the Town violated the Local 134 Agreement by retaliating against him for filing a grievance, and that such conduct is a violation of § 301 of the LMRA. The Town argues that this claim substantively fails, and that this claim fails because Farrar did not exhaust his administrative remedies. The court believes that it must address the exhaustion question before it can discuss the substance of Farrar's LMRA claim.

"Section 301 of the LMRA governs actions by an employee against an employer for breach of a collective bargaining agreement." *Dougherty v. Am. Tel. and Tel. Co.*, 902 F.2d 201, 203 (2d Cir.1990) (citing 29 U.S.C. § 185(a)). "Before bringing such an action, the employee must exhaust grievance procedures provided by the relevant collective bargaining agreement." *Id.* It is undisputed that Farrar's grievance, which relates to the suspension issued by White on July 1, 2004 and re-issued on August 17, 2004, remained pending at the time this action was filed. Thus, Farrar did not exhaust the relevant grievance procedures.

Nevertheless, Farrar argues that he should be excused from exhausting the grievance procedures. "The law will excuse an employee's failure to exhaust arbitration remedies in three circumstances: (1) where the employer has repudiated private grievance mechanisms, *see Vaca v. Sipes*, 386 U.S. [171,] 185, 87 S.Ct. 903, 17 L.Ed.2d 842 [ (1967) ] ...; (2) where the union has breached its duty of fair representation, *see id.; accord Air Line Pilots Ass'n v. O'Neill*, 499 U.S. [65,] 74–77, 111 S.Ct. 1127, 113 L.Ed.2d 51 [ (1991) ]; or (3) where the union member shows that arbitration would be futile, *see Glover v. St. Louis–San Francisco Ry. Co.*, 393 U.S. 324, 330–31, 89 S.Ct. 548, 21 L.Ed.2d 519 ... (1969)." *Vera v. Saks & Co.*, 208 Fed.Appx. 66, 68 (2d Cir.2006). In the complaint, Farrar had alleged a breach of the union's duty of fair representation, but he did not argue this point in his opposition memorandum. Therefore, the court shall consider this allegation to be abandoned. *See Ludwiczak*, 528 F.Supp.2d at 59.

This leaves Farrar's "futile and inadequate" argument for consideration.[7] "The futility exception allows an employee to bypass arbitration and file suit in federal court where employer repudiation or union breach of representation duty can reasonably be anticipated on account of the

---

7. It is not clear to the court if Farrar considers "futile and inadequate" as constituting separate exceptions to the exhaustion requirement, or if he considers the phrase "futile and inadequate" to constitute one exception. The law cited by the court mentions the futility exception, not an inadequacy exception. Therefore, the court shall consider the phrase "futile and inadequate" to constitute one exception, i.e., the futility exception.

employer's or union's prejudice or hostility toward the employee." *Vera*, 208 Fed. Appx. at 68 (citing *Glover*, 393 U.S. at 331, 89 S.Ct. 548). The court assumes that Farrar is claiming prejudice or hostility by the Town, as there is no indication in this case that Farrar had any quarrels with his union. Still, Farrar's claim against the Town fails here. Farrar presents no persuasive argument explaining why or how abiding by the grievance procedures would, in fact, be futile. Instead, Farrar mentions that futility is an exception to the exhaustion requirement, and states that summary judgment on this ground should be denied. Such a conclusory statement is insufficient to demonstrate that Farrar is exempt from the procedures provided in his collective bargaining agreement. Consequently, with regard to Farrar's LMRA claim, the Town's motion for summary judgment (**dkt.# 38**) is **GRANTED.**

## G. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Farrar alleges that the Town has intentionally inflicted emotional distress upon him. With respect to intentional infliction of emotional distress claims, the Connecticut Supreme Court has stated that, in order to recover damages on this theory,

> [i]t must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986), *superseded by statute on other grounds as recognized in Chadha v. Charlotte Hungerford Hosp.*, 272 Conn. 776, 865 A.2d 1163 (2005). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059 (2000). " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* at 210–11, 757 A.2d 1059 (citing 1 Restatement (Second) of Torts § 46, comment (d) (1965)).

■ The Town's conduct does not meet this standard. Thus, Farrar's allegations could not, as a matter of law, give rise to a claim for intentional infliction of emotional distress. The court shall not detail the facts of this case again, but the evidence in the records contains no evidence that the Town acted in a way that is so outrageous in character or extreme in degree that it went beyond all possible bounds of decency, or that the Town's actions could be regarded as atrocious and utterly intolerable in a civilized community. Being assigned duties that (in Farrar's estimation) were beneath him, not being selected for promotion, being disciplined for possible infractions of his job duties, being asked about retirement, being required to undergo medical examinations during and after an extended medical leave are not, in the court's view, actions that meet the intentional infliction of emotional distress standard. Consequently, with regard to Farrar's intentional infliction of emotional distress claim, the Town's motion for summary judgment (**dkt.# 38**) is **GRANTED.**

## III. CONCLUSION

For the foregoing reasons, the Town's motion for summary judgment (**dkt.# 38**) is **GRANTED in part and DENIED in part. Judgment in favor of the Town of Stratford shall enter on Counts One (Ti-**

tle VII failure to promote), Two (Title VII hostile work environment), Four (ADEA failure to promote and hostile work environment), Six (CFEPA race discrimination), Seven (CFEPA age discrimination), Nine (CFEPA aiding and abetting), Ten (LMRA), and Eleven (intentional infliction of emotional distress) of the complaint. Counts Three (Title VII retaliation), Five (ADEA retaliation), Eight (CFEPA retaliation), and Twelve (negligent supervision)[8] of the complaint shall remain in force.

---

8. Although the Town moved for summary judgment on "all counts of the complaint," the Town failed make an argument with regard to Farrar's negligent supervision claim. Indeed, in listing the counts of the complaint, the Town entirely neglected to mention Count Twelve, which is the negligent supervision claim. As a result, with regard to Count Twelve, the court shall not grant summary judgment.