Norman J. COLTIN, Plaintiff,

v.

**CORPORATION FOR JUSTICE MANAGEMENT, INC.,**
Defendant.

No. 3:06CV01111(DJS).

United States District Court,
D. Connecticut.

March 31, 2008.

---

Thomas W. Bucci, Willinger, Willinger & Bucci, Bridgeport, CT, for Plaintiff.

George J. Kelly, Jr., Michael John Spagnola, Siegel, O'Connor, O'Donnell & Beck, Hartford, CT, Meredith G. Diette, Siegel, O'Connor, O'Donnell & Beck, New London, CT, Dawn D. McDonald, Cooley Shrair, Springfield, MA, for Defendant.

### MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Norman J. Coltin ("Coltin"), brings this action pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Civil Rights Act of 1991, 42 U.S.C. § 1981; and the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. §§ 46a–60 *et seq.* ("CFEPA"), alleging that his former employer, Corporation for Justice Management, Inc. ("CJM") terminated his employment unlawfully because of his race, ancestry, ethnicity, religion, and age. Now pending is CJM's motion for summary judgment (dkt.# 17) pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."). For the reasons that hereafter follow, the motion for

summary judgment (**dkt.# 17**) is **GRANT-ED.**

## I. FACTS

Examination of the complaint, pleadings, Local Rule 56 statements, and the exhibits accompanying the motion for summary judgment, and the responses thereto, discloses the following, undisputed, material facts:

In 2002, CJM hired Coltin, who was 74, as a case manager, where he was responsible for monitoring CJM client reporting and performance, providing timely reports to referring agencies, and performing security functions and procedures such as urinalysis collections. At CJM, Coltin reported to two supervisors, Diane Lepper ("Lepper"), the Director of the Alternative Incarceration Center ("AIC"), and Rosario "Charo" Abreu ("Abreu"), the Assistant Director of AIC. Coltin, who has a B.A. and M.B.A. from Long Island University, operated a private counseling practice prior to his employment with CJM.

When CJM hired Coltin, it provided him with a copy of the company's policies and procedures. Pursuant to those policies, Coltin agreed to "not ... enter into any financial or business transactions with clients." (Dkt.# 18, Ex. B.) In addition, the anti-fraternization section of CJM's policies states: "Fraternization and/or business dealings of any kind with our participants or their family members is not allowed either during or outside of business hours.... If you violate either this policy or individual program guidelines, you may be subject to disciplinary action, up to and including termination." (*Id.*, Ex. E.)

During his tenure with CJM, Coltin was disciplined a number of times. Those disciplinary actions were as follows: (1) on March 18, 2003, CJM sent Coltin a written warning regarding his failure to present documents to a supervisor before sending them off site; (2) on January 12, 2004, CJM sent Coltin another disciplinary notice for failing to present documents to a supervisor prior to sending them off site. This January, 12 disciplinary notice, which had been issued by Abreu, was subsequently revoked by Lepper; (3) on May 12, 2003, CJM placed Coltin on probation for one month for allegedly mentioning in court that a client had tested positive for THC (Tetrahydrocannabinol), when in fact the client's tests had not yet returned from the lab. According to CJM, this conduct violated CJM's policies and procedures; (4) on August 18, 2004, CJM issued a written warning to Coltin for telling Abreu of a client's hepatitis condition in front of other clients. According to CJM, this conduct violated CJM's policies and the HIPAA regulations; (5) on September 28, 2004, CJM issued a disciplinary notice to Coltin for again violating CJM's policies and the HIPAA regulations. CJM alleges that Coltin promised a client not to disclose the client's "dirty" drug test if the client agreed to participate in the group counseling session. Also, CJM alleges that even after the client participated in the therapy, Coltin still disclosed the drug test in court.

Coltin signed off on all of the above disciplinary notices. Although each notice provided a space for Coltin to comment, he declined to comment on every notice except the September 28, 2004 notice. Coltin maintains, however, that he did in fact provide a written response to the March, 18, 2003 notice, yet neither side has any record of a response.

Coltin alleges that on numerous occasions Abreu referred to him as "hombre viejo," an old man, and "viejo judio," an old Jew. Coltin testified in his deposition that he is unable to pinpoint the occasions when these terms were used, and can only specifically recall one particular instance for

each. Coltin alleges that Abreu called him an "hombre viejo" during a meeting where Coltin had "dozed off." As Abreu noticed Coltin dozing off, she stated to the group "wake up the hombre viejo." Coltin could not recall the time period when this meeting occurred; however, he estimated that occurred in his first year of employment, which was 2002.

With regard to the specific "viejo judio" comment, Coltin recalls this instance taking place in Abreu's office while she was on the phone with her mother. As Abreu spoke with her mother, Coltin and a Spanish-speaking client sat in her office. Abreu allegedly concluded the conversation with her mother by saying "I got to attend to the viejo judio." Again, Coltin could not point to a specific date when this occurred, and although he maintains that Abreu referred to him as "viejo judio" on a number of other occasions, he is unable to pinpoint when those other instances occurred, either. In both of the specific instances referred to by Coltin, he relied on the translation of another person in order to understand the Spanish comments. Coltin alleges that only Abreu made the discriminatory remarks. At no time did Lepper harass Coltin, and he never filed a complaint regarding the alleged harassment by Abreu.

As part of the service to its clients, CJM allows clients to post business cards on a bulletin board to help them promote their respective businesses to other clients. Openeye Enterprise, LLC ("Openeye"), a car detailing business, had posted a business card on the client bulletin board within the AIC office. One of CJM's clients possessed an equity interest in Openeye.

On October 18, 2004, Lepper observed Coltin's car being driven into the staff parking lot, which caught her attention because she knew that Coltin was in the building at the time. Lepper then witnessed an employee of Openeye exit the car and enter the building. Subsequently, Lepper observed Coltin, the Openeye employee, and another CJM counselor, return to the parking lot and examine Coltin's car. Lepper recognized the employee of Openeye as a CJM client.

Coltin had received the contact information of Openeye from the AIC bulletin board. The card did not list any individual contact names. The only information on the card was the name and number of Openeye. Thus, Coltin alleges that he had no way of recognizing that the Openeye employee was a client of CJM, and that he did not employ a client of CJM, but rather a business entity owned by a CJM client. Coltin testified at his deposition that the postings on the bulletin board were generally by clients, and when asked if there were postings by non-clients, he responded that he could not recall. Still, Coltin maintains that he had previously employed the detailing services of another client with the approval of Abreu, who allegedly told Coltin that he could employ the services of a client if he paid with a personal check.

After the October 18, 2004 incident, CJM issued to Coltin an Employee Disciplinary Notice, which Abreu played no role in issuing. After CJM filed the notice, Lepper consulted Martin Lynch ("Lynch"), Vice President of Programming for CJM, and placed Coltin on unpaid leave for a period of ten days. CJM granted this leave in order to provide Coltin the opportunity to respond to his proposed dismissal. CJM has no record of a response, although Coltin alleges that he did, in fact, submit one. Specifically, he claims that he left one copy of his letter with Lepper, one with Abreu, and one on his desk. CJM subsequently terminated Coltin, who was 76 at the time, and replaced him with a younger employee. Lepper and Lynch were the only two supervisors responsible

for the Coltin's termination, a decision in which Abreu played no role.

## II. DISCUSSION

Coltin alleges that his termination was based upon his race, ancestry, ethnicity, religion, and age in violation of the ADEA, Title VII, 42 U.S.C. § 1981, and CFEPA. CJM, for its part, argues that Coltin's claims fail as a matter of law and that summary judgment should be entered in its favor. The court shall address the parties' arguments seriatim.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

### B. EMPLOYMENT DISCRIMINATION

Title VII of the Civil Rights Act of 1964 directs that it is "unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex or national origin...." 42 U.S.C. § 2000e–2 (a)(1). The ADEA directs that it is "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ...." 29 U.S.C. § 623(a)(1). The protections of the ADEA reach individuals who are at least 40 years old. 29 U.S.C. § 631(a). CFEPA directs that "[i]t shall be a discriminatory practice in violation of this section[ ][f]or an employer ... to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, ... national origin, [or] ancestry...." Conn. Gen.Stat. § 46a–60 (a)(1).

 Title VII claims are analyzed using the familiar burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Claims of age discrimination under the

ADEA are analyzed "under the same burden shifting framework as claims brought pursuant to Title VII. . . ." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001). In addition, "[t]he Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA." *Farrar v. Town Of Stratford,* 537 F.Supp.2d 332, 348–49 (D.Conn.2008); *see Levy v. Comm'n of Human Rights and Opportunities,* 236 Conn. 96, 103, 671 A.2d 349 (1996) ("Although this case is based solely on Connecticut law, we review federal precedent concerning employment discrimination for guidance in enforcing our own anti-discrimination statutes.") Accordingly, the court will analyze Coltin's Title VII, ADEA, and CFEPA claims together. *See Williams v. Quebecor World Infiniti Graphics,* 456 F.Supp.2d 372, 383 (D.Conn.2006).

■ In *McDonnell Douglas,* the Supreme Court established a three-part burden shifting test for establishing a claim of employment discrimination: "The complainant . . . must carry the initial burden under the statute of establishing a prima facie case. . . . The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's [termination]. . . . [The plaintiff must then] be afforded a fair opportunity to show that [defendant's] stated reason for [plaintiff's termination] was in fact pretext." *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817.

■ In *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court stated: "The burden of establishing a prima facie case [of employment discrimination] is not onerous." A prima facie case is established when "a plaintiff [can] show membership in the protected . . . group, qualifications for the jobs at issue, an adverse employment action, and that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *D'Cunha v. Genovese/Eckerd Corp.,* 479 F.3d 193, 195 (2d Cir.2007).

■ The first three prongs of the prima facie case are not in dispute. As to the fourth prong, CJM claims that Coltin cannot show that his termination occurred under circumstances giving rise to an inference of age discrimination. Coltin responds that his termination did occur under circumstances giving rise to an inference of age discrimination. Specifically, Coltin argues that the remarks made by Abreu are relevant in determining whether the plaintiff has proved a prima facie case, and that an inference of discrimination is raised because CJM hired a thirty-seven year old after Coltin had been terminated. Because Coltin's burden in establishing a prima facie case of employment discrimination is minimal, the court finds that, through the allegations of discriminatory remarks and the hiring of a significantly younger employee, Coltin has met his burden.

■ CJM then must articulate a legitimate, non-discriminatory reason for its decision to terminate Coltin. CJM has done so by alleging that Coltin's termination was based on his apparent use of the services of CJM client in violation of CJM's policies.

The burden then shifts back to Coltin in order to establish that CJM's articulated reason for his termination is merely a pretext for age discrimination. Coltin alleges that CJM has fabricated the reasons for terminating his employment. Specifically, Coltin argues that there was no way he could have known that Openeye was owned by a client of CJM because there was no indication on the flier posted on the bulletin board that Openeye was a CJM client. Coltin further argues that he was previously given permission by Abreu to employ

the services of a client so long as he paid using a personal check. Therefore, Coltin suggests that the decision to terminate him was completely arbitrary and pretextual. CJM, for its part, argues Coltin has presented no evidence that CJM's legitimate nondiscriminatory reason for his termination constitutes a pretext for discrimination. Specifically, CJM argues the two stray remarks made Abreu are not relevant because Ms. Abreu was not involved in the decision to terminate Coltin's employment. Additionally, CJM suggests that even if Coltin could prove that his conduct did not actually violate CJM's policies, he has not presented any evidence to suggest that CJM did not, in good faith, believe that he violated CJM's policies.

■ Even taking the facts of this case in a light most favorable to Coltin, the court finds that Coltin has failed to demonstrate pretext. In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court stated: "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation [for termination] that the employer is dissembling to cover up a discriminatory purpose." Nevertheless, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory." *Id.* at 148, 120 S.Ct. 2097. An example of when such a showing would not be sufficient is "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there

was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.*

■ Coltin maintains that the reason for his termination was a falsity because he was unaware that Openeye was owned by a client of CJM. Coltin also argues that he did not do business with a CJM client, but with a business entity (i.e., "Openeye Enterprise, LLC"), demonstrating that the reason for his termination lacks credence. Even accepting this as true,[1] Coltin has failed to show that CJM's reason for terminating Coltin, even if shown to be wrong or mistaken, was pretextual. As the Third Circuit has aptly noted, "[t]o discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 331 (3d Cir.1995) (internal quotation marks omitted). That is, absent some evidence that the termination was motivated by unlawful discrimination, the court is not in a position to evaluate CJM's business decisions.

Here, Coltin cannot show "that a reasonable factfinder could rationally find [the proffered reasons for termination are] unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* This is not a situation where CJM completely fabricated a reason for terminating Coltin. Lepper witnessed Coltin conducting what

---

1. The court harbors doubts about Coltin's argument in this regard. CJM's policies appear to be quite broad, prohibiting: (1) all financial or business transactions with clients; and (2) fraternization and/or business dealings *of any kind* not only with CJM participants, but also their family members. Thus, it seems unreasonable for Coltin to say that he did not violate this policy by engaging a business in which a CJM client possessed an equity interest, or by having a employee of that business, who was identified by Lepper as a CJM client, perform work on Coltin's car. Still, even accepting Coltin's argument, his claims here fail.

appeared to be a business transaction with a CJM client. It was not unreasonable for Lepper to believe that Coltin was aware that the Openeye employee was in fact a client of CJM, given that Coltin admittedly found Openeye's contact information on the bulletin board consistently used by CJM clients to promote their respective businesses.

Furthermore, even if Lepper were mistaken in her belief that Coltin had business dealings with a CJM client, Coltin has presented no independent evidence that his termination occurred because of wrongful discrimination. For the purposes of this motion, the court must assume that Abreu called Coltin an "hombre viejo" and a "viejo judio," comments that do relate to Coltin's race, ancestry, ethnicity, religion, and age. Lepper and Vice President Lynch, however, made the ultimate decision to terminate Coltin's employment, not Abreu. Indeed, Abreu played no role in the decision to terminate Coltin. As the Second Circuit has noted,

> [T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.... For example, remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision maker was motivated by the discriminatory sentiment expressed in the remark.

*Tomassi v. Insignia Fin. Group, Inc.,* 478 F.3d 111, 115 (2d Cir.2007). In the court's view, the alleged discriminatory remarks by Abreu, who played no role in the decision to terminate Coltin, fail to show that Lepper or Lynch, who were the decision makers, were motivated by discriminatory sentiment. Indeed, Coltin specifically denied that he had any problems with any employee other than Abreu. Therefore, these remarks are insufficient to demonstrate pretext.

The court also finds unpersuasive Coltin's allegation that he had previously employed the detailing services of another client with the approval of Abreu. Even accepting this allegation as true, the court fails to see how Abreu's conduct here can impute discriminatory sentiment to Lepper or Lynch. As noted above, Abreu did not make the decision to terminate Coltin. The fact that Abreu may have permitted Coltin to employ CJM clients in the past did not mean that Lepper, Abreu's superior, would do the same. Again, even if Lepper were incorrect in her understanding and implementation of CJM's policies, or even if Coltin, through Abreu's conduct, implicitly had permission to conduct business with clients, there is no evidence that wrongful discrimination played a role in Lepper's (or Lynch's) decision to terminate Coltin. Accordingly, because the record does not support a connection between the discriminatory treatment and the decision to terminate employment, it cannot, as a matter of law, support a cause of action for discrimination under Title VII, the ADEA, or CFEPA. Consequently, with regard to Coltin's Title VII, ADEA, and CFEPA claims, CJM's motion for summary judgment (**dkt.# 17**) is **GRANTED.**

### C. 42 U.S.C. § 1981

■ Coltin also alleges that CJM's conduct violated 42 U.S.C. § 1981. Section 1981(a) provides the following:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be

subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). To prove a § 1981 claim, a plaintiff must demonstrate "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993).

■ CJM is entitled to summary judgment on Coltin's § 1981 claim. To begin with, CJM moved for summary judgment on this issue, but, in his opposition memorandum, Coltin presented no legal arguments to support this claim. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Farrar,* 537 F.Supp.2d at 356 (internal quotation marks omitted). To be fair, though, although CJM moved for summary judgment on the § 1981 claim, its memoranda focused on the Title VII/ADEA/CFEPA claims, not the § 1981 claim. Therefore, even though summary judgment on this claim could be granted because it may be deemed abandoned, the court shall analyze the merits of that claim.

Coltin's § 1981 claim fails as a matter of law, as he does not demonstrate, either in his complaint or in any of his other submissions to the court, how he has satisfied the elements of a § 1981 claim. The court shall assume that Coltin has shown he is a member of a racial minority for the purposes of § 1981, as the Supreme Court has "ma[de] clear that § [ ] 1981 ... extend[s] to protect the Jewish 'race.'" *U.S. v. Nelson,* 277 F.3d 164, 177–78 (2nd Cir.2002) (citing *St. Francis Coll. v. Al–Khazraji,*

481 U.S. 604, 610–12, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 617–18, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987)).

■ Coltin does not, however, demonstrate that CJM's intended to discriminate against him on the basis of his race, or that his termination concerned one or more of the activities enumerated in the statute. First, "[a] plaintiff's efforts to establish the second element of a § 1981 claim are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII ...." *Jenkins v. NYC Transit Authority,* 201 Fed.Appx. 44, 45–46 (2d Cir.2006) (citing *Gant ex rel. Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 146 (2d Cir.1999)); *see Morris v. Yale Univ. Sch. of Med.,* 477 F.Supp.2d 450, 458 (D.Conn.2007). As the court has discussed above, Coltin's Title VII/ADEA/CFEPA claims failed under this burden-shifting analysis because there was no evidence of pretext. Thus, Coltin's § 1981 fails for the same reason, i.e., he cannot demonstrate that the reason proffered for his termination was pretext for wrongful discrimination.

Second, even if Coltin had met the second element of his § 1981 claim, he has not demonstrated that the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.). Indeed, the court is unsure as to which activity enumerated in the statute is at issue here because Coltin has not articulated what § 1981 activity applies. As a result, his § 1981 fails as a matter of law. Consequently, with regard to Coltin's § 1981 claim, CJM's motion for summary judgment (**dkt.# 17**) is **GRANTED.**

### III. CONCLUSION

For the foregoing reasons, Corporation for Justice Management, Inc.'s motion for

summary judgment (dkt.# 17) is **GRANT-ED**. Judgment in favor of the Defendant, Corporation for Justice Management, Inc., shall enter on all counts of the Plaintiff's complaint. The Clerk of the Court shall close this file.

**SO ORDERED.**