## CALL CENTER TECHNOLOGIES, INC., Plaintiff,

### v.

## GRAND ADVENTURES TOUR & TRAVEL PUBLISHING CORPORATION, INC. and Interline Travel & Tour, Inc., Defendants.

### No. 3:03CV01036(DJS).

United States District Court, D. Connecticut.

Feb. 18, 2009.

---

David P. Stich, Solomon Pearl Blum Heymann & Stich LLP, New York, NY, Kevin P. Chamberlin, Law Office of Kevin P. Chamberlin, Danbury, CT, for Plaintiff.

Laura Flynn Baldini, Law Offices of Laura Flynn Baldini, LLC, Farmington, CT, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Call Center Technologies, Inc. ("Call Center"), brings this action against the defendants, Grand Adventures Tour & Travel Publishing Corporation, Inc. ("GATT") and Interline Travel & Tour, Inc. ("Interline") alleging breach of contract and successor liability pursuant to Connecticut law.[1] Call Center has moved for the entry of a default judgment against GATT in the amount of $560,576.22, and Interline has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that hereafter follow, Call Center's motion for a default judgment **(dkt. # 192)** is **GRANTED,** and Interline's motion for summary judgment **(dkt. # 184)** is *GRANTED*. In addition, Interline's motion to bifurcate and motion to stay **(dkt. # 202)** is **DENIED as moot.**

## I. LOCAL RULE STATEMENTS OF FACT

Before setting forth the background facts of this case, the Court notes that Interline, in its Reply Memorandum, maintains that Call Center has failed to comply with Rule 56 of the Local Rules of Civil Procedure for the District of Connecticut ("D.Conn.L.Civ. R."). Specifically, Interline objects to certain portions of Call Center's "Local Rule 56(a)(2) Statement," which was filed with Call Center's opposition memorandum. Under Local Rule 56(a)(2), "[t]he papers opposing a motion for summary judgment shall include a document entitled 'Local Rule 56(a)2 Statement,' which states in separately numbered paragraphs ... corresponding to the paragraphs contained in the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted by the moving party is admitted or denied." D. Conn. L. Civ. R. 56(a)(2). "All material facts set forth in [the moving party's Local Rule 56(a)1] [S]tatement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)2." D. Conn. L. Civ. R. 56(a)(1).

Rule 56 of the Federal Rules of Civil Procedure "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir. 2002). The District of Connecticut has set forth rules that are meant to assist the

---

1. The Court has subject matter jurisdiction here because the matter in controversy exceeds $75,000 and is between entities that are citizens of different States. *See* 28 U.S.C. § 1332.

court when reviewing summary judgment motions. "The purpose of [Local] Rule 56 is to aid the court, by directing it to the material facts that the movant claims are undisputed and that the party opposing the motion claims are disputed." *Coger v. Connecticut,* 309 F.Supp.2d 274, 277 (D.Conn.2004). "Absent such a rule, 'the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties.'" *S.E.C. v. Global Telecom Servs., L.L.C.,* 325 F.Supp.2d 94, 108 (D.Conn.2004) (quoting *N.S. v. Stratford Bd. of Educ.,* 97 F.Supp.2d 224, 227 (D.Conn.2000)). "The Local Rules provide clear notice that 'failure to provide specific citations to evidence in the record as required by this Local Rule may result in sanctions, including … when the opponent fails to comply, an order granting the motion.'" *Id.* at 108–09 (quoting D. Conn. L. Civ. R. 56(a)(3)).

The Court takes note of Interline's objections. There are, however, some specific issues that the Court wishes to address. Interline, in its Local Rule Statement, maintains that two individuals involved in the underlying background of this case were not employees of GATT; in addition, Interline maintains that one of these individuals was not an officer of GATT, and the other was not a director of GATT. Call Center denied these factual statements. In the Court's view, though, Call Center has not cited to evidence in the record sufficient to support its denials. With regard to the individual whom Call Center intimates was a *de facto* director of GATT, Call Center cites to a deposition of a GATT officer who, according to Call Center, testified that the individual sat in on GATT's board of directors meetings. This officer's deposition does not support Call Center's denial, as the testimony in no way indicates that the individual in question had any of the powers or responsibilities of a director. Simply sitting in a board meet-

ing does not make someone a *de facto* director. With regard to the other individual, whom Call Center claims was a *de facto* officer of GATT, Call Center cited to no evidence whatsoever. As a result, the Court cannot accept the denials of those statements of fact. Therefore, those specific statements of fact are deemed admitted.

Interline's also maintains that certain personal loans were made by the two above-mentioned individuals to GATT. To support its factual allegations, Interline has submitted promissory notes and security agreements. Call Center, claiming that Interline has produced no proof of actual payments, denied these factual statements. In the Court's view, these denials are improper. To begin with, the denials contain no citations to the record, let alone citations supporting the denials. Additionally, Interline submitted a number of documents, such as promissory notes, showing that these individuals entered into loan agreements with GATT. These agreements created rights and responsibilities between the parties involved. The Court is unsure what further evidence Call Center would require in this regard. As a result, the Court cannot accept the denials of those statements of fact. Therefore, those specific statements of fact are deemed admitted.

Interline also alleges that a certain foreclosure auction took place. To show that this auction occurred, Interline has submitted a copy of a notice of public sale that was posted at the proper courthouse, a copy of a notice of public sale that was published in a newspaper, and the deposition testimony of someone who apparently attended the foreclosure auction. Despite the above evidence, Call Center, maintaining that there is a genuine issue of fact as to whether any actual foreclosure sale occurred, denied Interline's factual allegations. Call Center cites to nothing in the

record to support its denials or to rebut Interline's evidence regarding this foreclosure. As a result, the Court cannot accept the denials of those statements of fact. Therefore, those specific statements of fact are deemed admitted.

Finally, Interline maintains that its management consists of certain specific people, and that it has a certain number of shareholders and employees. To support these factual allegations, Interline cited to its own interrogatory responses. Call Center, objecting to Interline's use of its own interrogatory answers, denied Interline's factual assertions. Call Center's objections are improper here. Rule 56 of the Federal Rules of Civil Procedure specifically allows parties to use interrogatory answers for the purposes of summary judgment. See Fed.R.Civ.P. 56(e). Call Center served the interrogatories upon Interline. It may not object to Interline's use of these interrogatory responses simply because it did not like Interline's answers. Moreover, the interrogatories in question related to Interline's management structure, and to the number of Interline's shareholders and employees. These are interrogatories for which Interline, not Call Center, would have the most knowledge, and the Court sees no basis (i.e., evidence from Call Center that plainly rebuts Interline's interrogatory answers) for Call Center's denials. As a result, the Court cannot accept the denials of those statements of fact. Therefore, those specific statements of fact are deemed admitted.

## II. FACTS

Call Center is a Delaware corporation with a principal place of business in Brook-field, Connecticut. GATT was an Oregon corporation, incorporated on April 3, 1987, with a principal place of business in Austin, Texas. GATT, a publicly-traded company on the NASDAQ with over 1000 shareholders, provided travel services to travel agents, airline employees, and newlyweds, and published travel magazines. GATT's Chief Executive Officer was Matthew O'Hayer ("O'Hayer"), its President and Chief Operating Officer was Joseph Juba ("Juba"), and its Chief Financial Officer was Bob Roe ("Roe"). Duane Boyd ("Boyd") was a shareholder and director of GATT, but never an officer or employee. Interline is a Texas corporation with a principal place of business in Austin, Texas and an office in Boca Raton, Florida. Interline is a privately-held company that was incorporated in Texas on October 15, 2001. Interline was founded by Boyd, who is currently Interline's President, and Lawrence Fleischman ("Fleischman"), who is Interline's Chairman and Chief Executive Officer.

On June 16, 1998, Call Center entered into a Customer Agreement ("the Agreement") with "Grand Adventures Tour and Travel, Inc."[2] for the sale and purchase of a telephone system called an Aspect Call Center ("the Equipment"). The purchase price for the Equipment was $130,090 plus the costs to install the Equipment, which was $6,000. By the terms of the Agreement, GATT allowed Call Center to obtain a security interest in the Equipment to secure payment of the purchase price, installation charges, freight charges, and taxes related to the Equipment. GATT also agreed to execute any documents that

---

**2.** There is a dispute between Call Center and Interline as to whether "Grand Adventures Tour and Travel, Inc." is the same company as GATT. For the purposes of this motion, the Court shall accept as true Call Center's contention that "Grand Adventures Tour and Travel, Inc." was a typographical error, and that GATT was, in fact, the proper party to the Agreement.

Call Center reasonably required to protect its security interest. Call Center, however, took no steps to obtain a security interest in the Equipment. Call Center alleges that, aside from a $35,000 deposit, GATT failed to make payment under the Agreement.

In April 2001, GATT, which was experiencing financial difficulty, retained Boyd and Fleischman[3] as unpaid consultants to help GATT's management with its financial problems. Both Boyd[4] and Fleischman personally invested their money in GATT.[5] On May 24, 2001, GATT executed a promissory note to Boyd, whereby Boyd extended a $90,000 line of credit to GATT in exchange for a security interest in 65% of the issued and outstanding capital stock of Grand Adventures Tour and Travel (UK) Limited ("GATT UK"), a subsidiary of GATT, subject to a parallel security interest held by Fleischman. That same day, GATT executed a similar promissory note to Fleischman, whereby Fleischman extended a line of credit to GATT in the amount of $80,000.

Thereafter, on July 18, 2001, GATT executed further promissory notes to Boyd and Fleischman, whereby Boyd and Fleischman each were to lend $100,000 to GATT. Boyd and Fleischman received a security interest in all of GATT's assets or other property, including accounts, inventory, equipment, investment property, choses in action, general intangibles, and real estate. In addition, a security agreement, executed on July 18, 2001, secured

all the above-mentioned debts, including the lines of credits extended by Boyd and Fleischman, and the loans extended by Boyd and Fleischman.

By the summer of 2001, GATT was operating at a loss. GATT's financial problems resulted in layoffs of employees and the elimination of some of their travel publications. Further compounding GATT's financial woes were the September 11, 2001 terrorist attacks, which triggered additional layoffs and a reduction in the number of travelers seeking GATT's services. By September 27, 2001, GATT UK's business was shut down, and GATT could no longer process credit card transactions. Following the demise of GATT UK, Boyd and Fleischman resigned as GATT consultants. O'Hayer worked to obtain federal airline bail-out money and short-term loans to avert foreclosure on GATT's assets, but apparently his efforts were to no avail.

On October 9, 2001, counsel for Boyd and Fleischman sent to GATT, via certified mail, a notice of intent to accelerate and demand payment, stating that GATT had defaulted on the lines of credit and loans. GATT was given until October 19, 2001 to pay the full amounts due, which altogether totaled $340,000. On October 19, 2001, Boyd and Fleischman executed a transfer and assignment of notes and liens, assigning all their rights with regard to the lines of credit and loans to Interline. That

---

**3.** At the time, Fleischman was with Capital Vision Group, Inc.

**4.** Boyd resigned as a director of GATT on June 2, 2001.

**5.** As the Court has already noted, *see supra* Part I, Call Center maintains that Fleischman was a *de facto* director of GATT because he may have sat in on board of directors meetings. The evidence to which Call Center

cites, namely, Juba's deposition, is wholly insufficient to support this claim. Even if Fleischman sat in on some board meetings, Call Center has presented no evidence that Fleischman exercised the powers and duties of a director. Call Center's similar allegation about Boyd, that he was a *de facto* officer of GATT, fails for the same reason. The Court sees no evidence that Boyd exercised any such power.

same day, counsel [6] for Interline sent to GATT, via certified mail, a notice of intent to accelerate and demand payment. GATT was given until October 29, 2001 to pay the full amounts due. In addition, on October 19, 2001, Interline sent notices to GATT's secured creditors advising them of Interline's intent to conduct a public sale to dispose of GATT's collateral in order to satisfy GATT's indebtedness to Interline.

On October 22, 2001, a copy of Interline's notice of intent to conduct a public sale to dispose of GATT's collateral was posted at the regular place for posting foreclosure notices at the Travis County Courthouse in Austin, Texas. This notice included the date, time, and location at which the sale would occur. Additionally, from October 24, 2001 to October 28, 2001, Interline published a paid notice in the *Austin American Statesman* advising the public of the scheduled foreclosure sale.

GATT did not pay its debts by October 29, 2001. Therefore, on October 30, 2001, GATT's collateral was sold at a public foreclosure sale conducted at the Travis County Courthouse. The purchaser of the assets was Interline, and the bid price was $340,000. There were no other bidders at the sale, and Interline purchased GATT's assets subject to a first lien upon those assets by Wells Fargo Bank Texas, NA ("Wells Fargo"), one of GATT's creditors. At the time of the sale, GATT's assets were not encumbered by any security interest in favor of Call Center.

On October 30, 2001, Wells Fargo executed a transfer and assignment of debt claims and security interests, transferring and assigning its secured debt and liens to Boyd, without recourse, representations, or warranties. On November 1, 2001,

Boyd executed a similar transfer and assignment of debt claims and security interests, transferring and assigning half of the acquired Wells Fargo lien to DBMK Partners Ltd. ("DBMK") [7], and half to Fleischman. That same day, counsel for Boyd sent to Wells Fargo two checks in the amount of $52,500, one executed by Boyd on behalf of DBMK, and the other executed by Fleischman on his own behalf.

Interline has approximately 21 shareholders and 52 employees. As noted above, it is a privately-held company, and it has no majority shareholder. Interline offers to active and retired airline employees, as well as their parents, other family members, and friends, cruise and resort vacations at discounted prices. It also offers these vacations to active and retired members of the military, and active and retired Federal Express employees. Interline does not provide travel services to travel agents or newlyweds. Interline operates a website at www.perx.com. This was GATT's former website, which Interline asserts it purchased at the October 2001 foreclosure. Interline also asserts that it acquired GATT's tangible and intangible assets, including furniture, computers, office equipment, internet domain names, telephone numbers, and customer lists, from the foreclosure. In addition, Interline executed a property lease in November 2001 whereby it conducts its business operations at the same street address as GATT. According to Interline, though, its office suite was different from GATT's office suite.

Moreover, Interline offered employment to some former GATT employees, who were required to submit formal employment resignation correspondence to GATT

---

6. The Court notes that this was different counsel than counsel for Interline in this action.

7. From Boyd's deposition testimony, it appears that DBMK is a partnership owned by Boyd and his wife.

and complete new tax forms. Interline also offered employment to Boyd and Fleischman. Furthermore, following the foreclosure, Interline obtained a tax identification number, opened new bank accounts, and negotiated new contracts with customers on GATT customer lists. Interline opened merchant accounts so that it could process credit card transactions, and opened an account with the telephone company so that it could use the telephone numbers purchased at the foreclosure.

The crux of the matter, then, is the characterization of Interline. Call Center alleges that, in light of the above facts, Interline is the legal successor to GATT, and should be liable for GATT's debts. Interline, unsurprisingly, denies that it is a successor company to GATT, and maintains that it should not be held liable for GATT's debts.

## III. DISCUSSION

Interline now moves for summary judgment, arguing that it is not a successor company to GATT. In addition, Interline argues that if the Court finds that Interline is not a successor to GATT, the Court lacks personal jurisdiction over it. Call Center, in turn, argues that there are genuine issues of material fact precluding summary judgment, and that the Court does have personal jurisdiction over Interline. The Court shall discuss the parties' arguments seriatim.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

### B. SUCCESSOR LIABILITY

■ In order to determine whether successor liability may be imposed upon Interline because of the October 2001 foreclosure, "the Court must examine the substance of the transaction to ascertain its purpose and true intent." *Collins v. Olin Corp.,* 434 F.Supp.2d 97, 102 (D.Conn.2006) (internal quotation marks omitted). "Generally, a corporation that acquires the assets of another entity does not assume that entity's former liabilities." *Id.* In Connecticut, four exceptions to this general principle apply:

[A] corporation which purchases all the assets of another company does not become liable for the debts and liabilities of its predecessor unless: (1) the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms [or a "de facto merger"]; (3) the purchaser is a "mere continuation" of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability.

*Id.* (quoting *Ricciardello v. J.W. Gant & Co.,* 717 F.Supp. 56, 58 (D.Conn.1989)). Here, there is no evidence of a purchase agreement that expressly or implicitly provides for Interline being a successor to GATT. Call Center's claim against Interline appears to allege that the *de facto* merger, mere continuation, and fraudulent transaction exceptions apply.

### 1. *De Facto* Merger/Mere Continuation

"For the purposes of determining successor liability, analysis of a 'mere continuation' and a '*de facto* merger' may be treated together." *Id.* at 103. As Judge Droney noted in *Collins,* Connecticut courts, when considering whether a "*de facto* merger" or a "mere continuation" of the former entity has occurred, require the weighing of four factors:

(1) continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (4) the purchasing corporation assumes those liabilities and

obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Id.* at 103 (collecting cases).

■ With regard to continuity of enterprise, the Court considers the following factors: management, personnel, physical location, assets and general business operations of the companies. GATT's management consisted of the following people: O'Hayer (CEO); Juba (President and COO); and Roe (CFO). Interlines management consists of the following people: Boyd (President); Fleischman (Chairman and CFO); Juba (Executive VP); Fernando Cruz Silva ("Silva") (Senior VP); and Patricia Macchi ("Macchi") (VP). In the Court's view, this factor favors Interline. O'Hayer, GATT's CEO, is not part of Interline's management, although he appears to be an Interline shareholder. Juba, Interline's Executive VP, was GATT's President and COO; nonetheless, Juba has testified that his duties and responsibilities at Interline are not similar to those he had at GATT. Silva and Macchi, who were both GATT employees, are now management at Interline. Boyd and Fleischman, who have the highest management positions at Interline, were neither employees nor officers at GATT.[8] In light of the above, the Court finds that there was no continuity of management between GATT and Interline.

■ With regard to the personnel and general business operations of the companies, the Court does not believe that Call Center has established factual disputes sufficient to survive summary judgment. There is some overlap between GATT personnel and Interline personnel, whereby approximately 31 out of Interline's 51 full-

---

8. Again, Boyd had been on GATT's board of directors for a time, and he apparently was a shareholder, but there is no evidence that he was either a *de jure* or *de facto* officer at GATT. With regard to Fleischman, Call Center does not even allege that he was a *de facto* officer at GATT.

time employees had been former GATT employees. Interline, however, required those employees to resign from GATT and complete new tax forms. In addition, Interline provides some, but not all, of the same services GATT provided. In the Court's view, however, these factors are insufficient to establish that Interline is a mere continuation of GATT. "In evaluating [the] evidence, ... the Court's focus is not whether there is a continuation of the business but rather the test is whether there is a continuation of the corporate identity of the seller." *Id.* at 104. "Retaining many of the jobs of the ... workers [of the former company] ... and even manufacturing many of the same pre-acquisition products have little weight in determining corporate identity; to hold otherwise likely would expose most assets purchasers to post-acquisition successor liability." *Id.*

It defies logic and fairness to find Interline to be a successor to GATT simply because it hired former GATT employees who presumably had the skills Interline needed and required to operate its business. Moreover, although there is similarity between the services provided by GATT and Interline, those services are not identical. GATT provided services to, *inter alia,* travel agents and newlyweds, which Interline does not do, whereas Interline provides services to, *inter alia,* Federal Express employees and military personnel, which GATT did not do. GATT also published certain travel magazines, which Interline did not continue to publish. Thus, these factors weigh in favor of Interline.

With regard to the physical locations of GATT and Interline, the parties dispute whether these companies had the same location. Both GATT and Interline operated from 211 West 7th Street, Austin, Texas. Interline has submitted evidence that the two companies, although operating on the same floor, were located in different suites. In the Court's view, though, even if they had operated in the same suite, this would be insufficient to find successor liability. Simply having the same physical location is not dispositive on this issue. Moreover, there is evidence that, instead of taking over GATT's lease, Interline signed its own lease for the premises, indicating that Interline was not simply a continuation of GATT. The Court thus finds that this factor weighs in favor of Interline.

With regard to assets, Interline did acquire GATT's tangible and intangible assets, including GATT's website. Interline has submitted evidence, which Call Center has not rebutted, that Interline purchased GATT's assets from a foreclosure sale. The Court declines to find that the purchase of assets from such a foreclosure sale would, without more, make the buyer (here, Interline) a successor to the defunct company (here, GATT). Interline had notified GATT's secured creditors (which did not include Call Center) about the sale, paid for GATT's assets at the sale, and assumed Wells Fargo's first lien on GATT's assets. There is no indication that Interline, via the foreclosure sale, agreed to assume any other of GATT's liabilities or obligations, and the general rule is that "[a] purchaser of assets at a foreclosure sale does not assume the seller's liabilities...." *Quinn v. Teti,* 234 F.3d 1262, 2000 WL 1616806, at *2 (2d Cir.2000). The Court thus finds that this factor weighs in favor of Interline.

In addition to looking at the continuity of enterprise, the Court must also look to the continuity of shareholders. GATT was a publicly-traded company on the NASDAQ with over 1000 shareholders. Interline is a privately-held company that, at its inception, had two shareholders, and now has approximately 21 shareholders. The Court sees no continuity between

GATT and Interline in this regard. Thus, the Court finds that this factor weighs in favor of Interline.

As for the remaining factors, i.e., whether the seller corporation ceased its ordinary business operations, liquidated, and dissolved as soon as legally and practically possible, and whether the purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business, there is little need for discussion, as the parties have not focused on these issues. From what the Court can discern in the record, GATT was foreclosed upon and its assets were sold. Call Center, although consistently casting aspersions on the foreclosure sale in question, has provided no analysis as to how the sale was contrary to Texas law, or why Interline was not a bona fide purchaser for value. In short, Call Center has not demonstrated that the foreclosure sale was, for whatever reason, illegal, and the Court shall not assume that it was. With regard to Interline's assumption of GATT's liabilities and obligations, it appears that Interline did not expressly assume any of GATT's liabilities or obligations aside from the Wells Fargo lien. As a result, the Court finds that these factor weigh in favor of Interline. Consequently, given the above, the Court finds that Interline was not a successor to GATT under the *de facto* merger/mere continuation theories.

### 2. Fraudulent Transaction

■ With regard to the fraudulent transaction theory, whereby successor liability is imposed when a transaction was entered into fraudulently for the purpose of escaping liability, the Court believes there is little need for much discussion.

In its submissions, Call Center consistently insinuates that there was some fraudulent activity involved in this case. Such insinuations are insufficient for summary judgment.

To begin with, Call Center has failed to provide a substantive legal analysis on the fraud issue in response to Interline's arguments. With regard to the peripheral issues surrounding this fraud theory, namely Interline's statute of limitations and pleading with particularity arguments, Call Center does provide some analysis. Nevertheless, with regard to the meat of this fraud theory, namely, an application of the facts to the relevant law, Call Center provides no analysis. There is no section of Call Center's memorandum of law that discusses how Interline's or GATT's conduct was fraudulent. For that reason alone, the Court considers such any successor liability claim based on the fraudulent transaction theory to be abandoned. *See Coltin v. Corp. for Justice Mgmt., Inc.,* 542 F.Supp.2d 197, 206 (D.Conn.2008).

■ Even if the fraud theory were not abandoned, the Court sees nothing in the record to support that Interline's or GATT's actions were fraudulently done for the purpose of escaping the debt owed to Call Center under the Agreement. Call Center has provided the Court with nothing demonstrating that the giving of security interests to Boyd and Fleischman, or the formation of Interline, or the foreclosure sale was somehow wrongful. Call Center also has not shown that any of these things were done simply in order to deprive Call Center of its money.[9] That is, even if Call Center had shown some wrongful conduct here (which it has not),

---

9. As the Court noted above, Interline has submitted evidence regarding 9 the existence of the loans given to GATT and the occurrence of the foreclosure sale. Call Center's naked assertions that there were no loans, or that the foreclosure sale did not occur, is not evidence.

there is no evidence that such conduct was done with the specific intent to defraud Call Center. Merely calling it fraud does not make it so. Call Center cannot rest on insinuation and innuendo to demonstrate fraud. It certainly cannot do so when opposing a motion for summary judgment, for which it should have obtained, through discovery, enough evidence to support its claims.

In sum, the Court has found that Interline is not a successor to GATT under any of the legal theories alleged by Call Center. Consequently, with regard to the Second Count (Successor Liability), Interline's motion for summary judgment (**dkt. # 184**) is **GRANTED.** Because Interline is not a successor to GATT, and because Interline was not a party to the Agreement, Call Center cannot maintain a breach of contract claim against Interline under the Agreement, and Interline is not liable for the amount of any damages owed by GATT to Call Center. Therefore, judgment in favor of Interline shall enter on all claims against Interline in the third amended complaint.[10]

## C. DEFAULT JUDGMENT

On November 2, 2007, Call Center moved pursuant to Rule 55(a) of the Federal Rules of Civil Procedure for an entry of default against GATT for failure to plead in this case. GATT has never had an attorney enter an appearance on its behalf in this case. The Court granted the motion for default on November 5, 2007, and directed Call Center to file its motion for default judgment pursuant to Rule 55(b) on or before December 5, 2007. (*See* dkt. # 188.)[11] On December 5, 2007, Call Center moved for the entry of a default

judgment against GATT in the amount of $560,576.22. This amount represents the following: (1) $101,090 for the principal amount GATT has not paid for the Equipment; (2) $13,990 for the principal amount GATT has not paid for additional parts; and (3) $445,496.22 for prejudgment interest on the Equipment (1.5% per month for 108 months) and the additional parts (1.5% per month for 93 months). No objection has been filed as to this amount. Therefore, Call Center's motion for default judgment (**dkt. # 192**) is **GRANTED,** and a default judgment against GATT in the amount of $560,576.22 shall enter.

## IV. CONCLUSION

For the foregoing reasons:

(1) Call Center's motion for a default judgment (**dkt. # 192**) is **GRANTED.** *The clerk shall enter a default judgment in favor of Call Center Technologies, Inc., and against Grand Adventures Tour & Travel Publishing Corporation, Inc., in the amount of $560,576.22;*

(2) Interline's motion for summary judgment (**dkt. # 184**) is **GRANTED.** *Judgment in favor of Interline Travel & Tour, Inc. shall enter on all claims against it in the third amended complaint;* and

(3) Interline's motion to bifurcate and motion to stay (**dkt. # 202**) is **DENIED as moot.**

The clerk shall close this file.

---

**10.** In light of the Court's decision, Interline's personal jurisdiction argument is moot.

**11.** The Court also instructed Call Center to mail a copy of its order to GATT at its usual place of business.